**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.



FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 1 2 2017
CHIEF JUSTICE

This opinion was filed for record

at 8:00am on Jan 12, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 92454-6 |
| | ) | |
| v. | ) | |
| | ) | EN BANC |
| JOEL RODRIGUEZ RAMOS, | ) | |
| | ) | |
| Petitioner. | ) | Filed: JAN 1 2 2017 |

YU, J.—When a juvenile offender is sentenced in adult court, youth matters on a constitutional level. Even for homicide offenses, "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012) (citing U.S. CONST. amend VIII). Therefore, where a convicted juvenile offender faces a possible life-without-parole sentence, the sentencing court must conduct an individualized hearing and "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 2469. This individualized *Miller* hearing "gives effect to *Miller*'s substantive

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Ramos*, No. 92454-6

holding that life without parole is an excessive sentence for children whose crimes

reflect transient immaturity." *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct.

718, 735, 193 L. Ed. 2d 599 (2016).

As a juvenile homicide offender facing a de facto life-without-parole

sentence, petitioner Joel Rodriguez Ramos was entitled to a *Miller* hearing, just as

a juvenile homicide offender facing a literal life-without-parole sentence would be.

Based on the record presented, we hold that Ramos did receive a constitutionally

adequate *Miller* hearing and he has not shown that his aggregated 85-year sentence

violates the Eighth Amendment. We decline to engage in an independent state

constitutional analysis because the issue is inadequately briefed. We further hold

that the State did not breach the plea agreement, and we therefore affirm the Court

of Appeals in result.

## FACTUAL BACKGROUND

The basic facts of Ramos' offenses are undisputed:

> Mr. Ramos and his friend, Miguel Gaitan, both 14, broke into the Skelton family home on March 24, 1993. They were armed with knives. Mr. Michael Skelton, who was disabled, confronted the burglars and was stabbed and beaten to death by the two young men. Mr. Gaitan then attacked and killed Mrs. Lynn Skelton in the bathroom shower. He stabbed her 51 times and also beat her with a baseball bat. Twelve-year-old Jason Skelton went to his mother's aid. Gaitan killed him as well; Jason's body was found near his mother's.
>
> The two young men searched the house for items to steal. They found six-year-old Bryan Skelton in his bedroom and told the

2

youngster to go to sleep. They pulled the bedcovers over his head, and Mr. Ramos then hit Bryan in the head with a piece of firewood, fracturing his skull. Bryan was also stabbed in the heart. Mr. Ramos later told the court that he killed Bryan in order to prevent him from identifying the two assailants.

*State v. Ramos*, 152 Wn. App. 684, 687-88, 217 P.3d 384 (2009) (footnote omitted). In his statement on plea of guilty, Ramos stated that "at one point, I ran outside. But then I ran back in. Later while inside I picked up a piece of firewood and hit Brian Skelton in the head with it so he could not identify us later." Clerk's Papers (CP) at 80. A juvenile detention employee overheard Gaitan tell another detainee "that it was a gang initiation and that they were to burglarize the house. If anybody was there, they were supposed to take care of them." 1 Report of Proceedings (RP) at 49.

## PROCEDURAL HISTORY

In August 1993, Ramos pleaded guilty in superior court to one count of first degree premeditated murder for the death of Bryan Skelton and three counts of first degree felony murder for the deaths of Michael, Lynn, and Jason Skelton.[1] "Both parties recommended that the court impose the minimum possible sentence—consecutive 240 month terms on each count." *Ramos*, 152 Wn. App. at 689.

---

[1] As part of his plea agreement, "Ramos agreed to waive juvenile court jurisdiction and plead guilty in superior court." *Ramos*, 152 Wn. App. at 688. There are no issues regarding the validity of the plea agreement or the waiver of juvenile court jurisdiction currently before this court.

3

*State v. Ramos*, No. 92454-6

Although the sentencing court opined "that the murder of Bryan Skelton deserved more than 240 months, the court nonetheless imposed the requested sentence." *Id.* Ramos' term of total confinement was thus 960 months (80 years). CP at 15.

Thirteen years later, Ramos filed both an appeal and a personal restraint petition (PRP). After this court ordered the Court of Appeals to proceed with the appeal as though it were timely filed, the Court of Appeals rejected Ramos' appeal on the merits and dismissed his PRP. This court granted review only as to the community placement term of Ramos' sentence, and "remanded to the Court of Appeals for reconsideration in light of *State v. Broadaway*, 133 Wn.2d 118, 942 P.2d 363 (1997)." Order, *State v. Ramos*, No. 83819-4 (Wash. Apr. 1, 2010). The Court of Appeals in turn remanded to the trial court for clarification of the "'period of community placement required by law.'" *State v. Ramos*, noted at 156 Wn. App. 1041, 2010 WL 2487831, at *2 (quoting *Broadaway*, 133 Wn.2d at 136). Ramos again petitioned this court for review, and in a per curiam opinion, this court held that the trial court was required to exercise discretion in order to comply with the Court of Appeals decision, and that "Ramos, therefore, has a right to be present and heard at resentencing." *State v. Ramos*, 171 Wn.2d 46, 49, 246 P.3d 811 (2011).

By the time Ramos' case was remanded for resentencing, the original sentencing judge had retired. A new judge conducted Ramos' resentencing, at

4

which Ramos argued for an exceptional sentence below the standard range, with his 20-year sentences on each count "to run concurrently rather than consecutively." *State v. Ramos*, No. 30279-2-III, slip op. at 4 (Wash. Ct. App. Apr. 16, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/302792.pdf. The resentencing court believed that it did not have authority to consider an exceptional sentence downward and denied Ramos' request. Ramos appealed.

The Court of Appeals noted that the procedural history "presented the trial court, and now us, with a uniquely complex set of issues." *Id.* at 6. It ultimately concluded that the sentencing court abused its discretion in determining that it did not have the authority to consider Ramos' arguments for an exceptional sentence. Therefore, the Court of Appeals remanded for resentencing but noted that

> [w]e do not mean to express a view on how the trial court should exercise its discretion. Mr. Ramos committed a heinous crime. The appropriate sentence is the trial court's domain. We only point out that Mr. Ramos has presented real reasons why a court might choose to reduce his sentence. He should have the opportunity to have his request considered with the correct law in mind.

*Id.* at 35.

The matter currently on review is Ramos' second resentencing, which was held before a third judge. Ramos presented evidence and argument supporting an exceptional sentence below the standard range, specifically "asking for the three

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

felony murder convictions to be run concurrently," 2 RP at 156, resulting in a total aggregate sentence of 320 months (26 years and 8 months), *id.* at 158. The State presented its own evidence and argument opposing an exceptional sentence, and asked that the court "deny the exceptional sentence and just reaffirm the sentence of 80 years." *Id.* at 144. However, the State acknowledged the court's authority to impose a different sentence within the standard range or an exceptional sentence downward.

The court denied Ramos' request for an exceptional sentence and imposed a sentence near the bottom of the standard range: 20-year sentences for each of the three felony murder convictions and a 25-year sentence for the premeditated murder of Bryan Skelton, all to run consecutively, for a total of 85 years. Ramos appealed, and the Court of Appeals affirmed in a published opinion, reasoning that *Miller* applies to literal life-without-parole sentences but not to de facto life-without-parole sentences resulting from aggregate consecutive sentences for multiple homicides. *State v. Ramos*, 189 Wn. App. 431, 452, 357 P.3d 680 (2015). We granted Ramos' petition for review. *State v. Ramos*, 185 Wn.2d 1009, 367 P.3d 1083 (2016).

## ISSUES

A. Is this appeal moot in light of recent legislative action?

B. Is Ramos' sentence constitutionally permissible?

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

1.   Does *Miller* apply to a juvenile homicide offender who is facing a de facto life-without-parole sentence due to the aggregation of standard range consecutive sentences?

2.   If *Miller* applies, did Ramos' second resentencing comply with its requirements?

3.   Does article I, section 14 of the Washington Constitution impose greater procedural or substantive protections than the Eighth Amendment as applied to this case?

C.   Did the State breach the plea agreement?

## STANDARD OF REVIEW

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, provides that a standard range sentence "shall not be appealed." RCW 9.94A.585(1); *see also* former RCW 9.94A.210(1) (1989). "However, this prohibition does not bar a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003). Accordingly, Ramos challenges his standard range consecutive sentences on the basis that they were imposed pursuant to a statutory system that is unconstitutional as applied to him. Constitutional interpretation is a question of law reviewed de novo. *State v. MacDonald*, 183 Wn.2d 1, 8, 346 P.3d 748 (2015).

When evaluating Ramos' contention that the State breached its plea agreement, we must "review [the] prosecutor's actions and comments objectively

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from the sentencing record as a whole to determine whether the plea agreement was breached." *State v. Carreno-Maldonado*, 135 Wn. App. 77, 83, 143 P.3d 343 (2006). A breach occurs when the State "undercut[s] the terms of the agreement explicitly or implicitly by conduct evidencing an intent to circumvent the terms of the plea agreement." *Id.* Nevertheless, we review the State's actions objectively, focusing "on the effect of the State's actions, not the intent behind them." *State v. Sledge*, 133 Wn.2d 828, 843 n.7, 947 P.2d 1199 (1997). Where the plea agreement is unambiguous, as it is here, our review is de novo. *MacDonald*, 183 Wn.2d at 8; *State v. E.A.J.*, 116 Wn. App. 777, 784-85, 67 P.3d 518 (2003).

## ANALYSIS

The SRA provides that when a person is convicted of "two or more serious violent offenses arising from separate and distinct criminal conduct," standard range consecutive sentences will be imposed for each offense. RCW 9.94A.589(1)(b); *see also* former RCW 9.94A.400(1)(b) (1990). This standard range consecutive sentencing may, and in this case did, result in a total prison term exceeding the average human life-span—that is, a de facto life sentence.

The person being sentenced pursuant to the SRA carries the burden of proving by a preponderance of the evidence "that there are substantial and compelling reasons justifying an exceptional sentence" below the standard range. RCW 9.94A.535; *see also* former RCW 9.94A.120(2) (1992); *In re Pers. Restraint*

8

*of Mulholland*, 161 Wn.2d 322, 328-30, 166 P.3d 677 (2007). Generally speaking, such an exceptional sentence may be for a reduced term of years, for concurrent rather than consecutive sentences, or both. The fundamental question presented is whether, in light of *Miller*, this statutory sentencing system is unconstitutional as applied to a juvenile offender who commits multiple homicides.

We hold that while not every juvenile homicide offender is automatically entitled to an exceptional sentence below the standard range, every juvenile offender facing a literal or de facto life-without-parole sentence is automatically entitled to a *Miller* hearing. At the *Miller* hearing, the court must meaningfully consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation where a life-without-parole sentence for a juvenile homicide offender is constitutionally permissible. If the juvenile proves by a preponderance of the evidence that his or her crimes reflect transient immaturity, substantial and compelling reasons would necessarily justify an exceptional sentence below the standard range because a standard range sentence would be unconstitutional.

On the record presented, Ramos received an adequate *Miller* hearing at his second resentencing and he has not shown that his sentence violates the Eighth Amendment. We also hold the State did not breach the plea agreement and therefore affirm.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Ramos*, No. 92454-6

A.    The appeal is not moot

After Ramos' second resentencing, our legislature enacted RCW 9.94A.730

in response to the ever-evolving jurisprudence regarding juvenile sentencing. That

statute provides, in relevant part:

> Notwithstanding any other provision of this chapter, any person
> convicted of one or more crimes committed prior to the person's
> eighteenth birthday may petition the indeterminate sentence review
> board for early release after serving no less than twenty years of total
> confinement, provided the person has not been convicted for any
> crime committed subsequent to the person's eighteenth birthday, the
> person has not committed a disqualifying serious infraction as defined
> by the department in the twelve months prior to filing the petition for
> early release, and the current sentence was not imposed under RCW
> 10.95.030 [pertaining to sentences for aggravated first degree murder]
> or 9.94A.507 [pertaining to sentences for sex offenders].

RCW 9.94A.730(1). For the first time in its supplemental brief, the State suggests

that the issues presented in this appeal are now moot because Ramos may petition

for early release pursuant to RCW 9.94A.730, which would in fact reduce his

sentence. We disagree. The possibility of another remedy in the future cannot

displace Ramos' right to appeal his sentence on the basis that it was unlawfully

imposed in the first instance.

We acknowledge that the Supreme Court has held that for cases on collateral

review, life-without-parole sentences previously imposed without proper *Miller*

hearings may be remedied "by permitting juvenile homicide offenders to be

considered for parole, rather than by resentencing them." *Montgomery*, 136 S. Ct.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

at 736. However, this case is before us on direct appeal, and at the time of Ramos' second resentencing, there was no provision of law that would have allowed him to ever be considered for parole. He was unquestionably facing a de facto life-without-parole sentence, and we are reviewing his case on direct appeal to determine whether that sentence was lawfully imposed. If it was not, he is entitled to resentencing. The appeal is not moot. *State v. Ronquillo*, 190 Wn. App. 765, 778-79, 361 P.3d 779 (2015).

B.      On the record presented, Ramos' sentence is constitutionally permissible

*Miller* establishes a substantive rule that a life-without-parole sentence cannot be imposed on a juvenile homicide offender whose crimes reflect transient immaturity. Therefore, where a juvenile offender facing a standard range life-without-parole sentence proves that his or her crimes reflect transient immaturity, the juvenile has necessarily proved that there are substantial and compelling reasons for an exceptional sentence downward. *Miller* anticipates that most juveniles will be able to meet this burden of proof, and we now explicitly hold that all juvenile homicide offenders must be given the opportunity to do so at a *Miller* hearing.

However, *Miller* does not require that the State assume the burden of proving that a standard range sentence should be imposed, rather than placing the burden on the juvenile offender to prove an exceptional sentence is justified. It

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

also does not require the sentencing court to consider mitigating evidence otherwise prohibited by Washington law or to make an explicit finding that the offense reflects irreparable corruption on the part of the juvenile. We do not intend to discount the potential benefits of such procedural requirements; we hold only that Ramos has not shown that the specific procedures enumerated in this paragraph are required as a matter of federal constitutional law. We also decline to decide at this time whether the state constitution requires greater protections than the federal constitution. We therefore hold that on the record presented, Ramos' second resentencing satisfied *Miller*'s minimal requirements.

1.  *Miller* applies equally to literal and de facto life-without-parole sentences

The parties all agreed, at both the trial and appellate courts, that Ramos was entitled to a full *Miller* hearing at his second resentencing. However, the Court of Appeals suggested the parties were incorrect on this issue, and because other Washington appellate decisions have reached differing conclusions, we address its merits. *See, e.g., id.* at 785 n.7; *State v. Solis-Diaz*, 194 Wn. App. 129, 140-41, 376 P.3d 458 (2016). We now join the majority of jurisdictions that have considered the question and hold that *Miller* does apply to juvenile homicide offenders facing de facto life-without-parole sentences.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The Court of Appeals suggested that *Miller* is inapplicable here based on two observed differences between this case and *Miller*: (1) *Miller* involved sentencing for single homicides, while this case involves sentencing for multiple homicides and (2) *Miller* involved single sentences of life without parole, while this case involves four consecutive sentences totaling 85 years' confinement without the possibility of early release. *Ramos*, 189 Wn. App. at 452. Those observations are accurate, but do not provide a principled basis on which to hold *Miller* does not apply. To the contrary, *Miller*'s reasoning clearly shows that it applies to any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation. Ramos unquestionably faced such a sentence.

Focusing on the number of victims is justified but misplaced. Of course, the number of victims is highly relevant to determining an appropriate sentence. However, nothing about *Miller* suggests its individualized sentencing requirement is limited to single homicides because "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes.*" *Miller*, 132 S. Ct. at 2465 (emphasis added). Even the most egregious facts presented by a particular case cannot automatically negate a juvenile homicide offender's right to a *Miller* hearing. As the *Miller* Court explained,

13

> We have consistently held that limiting a mandatory death penalty law to particular kinds of murder cannot cure the law's "constitutional vice" of disregarding the "circumstances of the particular offense and the character and propensities of the offender." *Roberts v. Louisiana*, 428 U.S. 325, 333, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (plurality opinion); see *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). The same analysis applies here, for the same reasons.

*Id.* at 2471 n.9. Moreover, a properly conducted *Miller* hearing does not in any way permit sentencing courts to disregard the number of victims in determining an appropriate sentence. *Miller* explicitly requires sentencing courts "to take into account the differences among defendants *and crimes*." *Id.* at 2469 n.8 (emphasis added).

For similar reasons, we also reject the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences. Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same. *Cf. State v. McNeil*, 59 Wn. App. 478, 481, 798 P.2d 817 (1990) (rejecting a defendant's argument that two consecutive life-without-parole sentences were excessive because the distinction between

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

concurrent and consecutive life terms "is academic; the sentence is ultimately limited by Mr. McNeil's life span").

Many other jurisdictions have confronted this issue and have reached varying results. Some have squarely held that *Miller* does apply to de facto life-without-parole sentences.[2] Applying similar reasoning, some have held that the prohibition on life-without-parole sentences for nonhomicide juvenile offenders in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), applies to de facto life-without-parole sentences.[3] Other courts have rejected this reasoning.[4] Ultimately though, "most courts that have considered the issue agree that a lengthy term of years for a juvenile offender will become a de facto life sentence at some point."[5] *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 74, 115

---

[2] *See, e.g., Casiano v. Comm'r of Corr.*, 317 Conn. 52, 72-75, 115 A.3d 1031 (2015); *Bear Cloud v. State*, 2014 WY 113, ¶ 33, 334 P.3d 132; *State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013) (decided on state constitutional grounds).

[3] *See, e.g., Henry v. State*, 175 So. 3d 675, 679-80 (Fla. 2015); *State v. Boston*, 363 P.3d 453, 457-58 (Nev. 2015).

[4] *See, e.g., Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir. 2012) (*Graham*'s prohibition on life-without-parole sentences for juvenile nonhomicide offenses "did not clearly establish" that de facto life without parole is unconstitutional for purposes of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214); *State v. Brown*, 12-0872, p. 15 (La. 5/7/13), 118 So. 3d 332 (*Graham* does not forbid de facto life-without-parole sentences for nonhomicide juvenile offenders); *State v. Kasic*, 228 Ariz. 228, 265 P.3d 410, 415-16 (2011) (same).

[5] It is undisputed that Ramos' 85-year aggregate sentence is a de facto life sentence, so the question of precisely how long a potential sentence must be in order to trigger *Miller*'s requirements is not before us. We reserve ruling on that question until we have a case in which it is squarely presented.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

A.3d 1031 (2015). Given that the majority of jurisdictions agree on this point and it is consistent with both common sense and Washington case law, we follow suit.

Regardless of labeling, it is undisputed that Ramos was in fact sentenced to die in prison for homicide offenses he committed as a juvenile. *Miller* plainly provides that a juvenile homicide offender cannot be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation unless the offender first receives a constitutionally adequate *Miller* hearing. The next question is therefore whether Ramos in fact received such a hearing at his second resentencing.

2.     Ramos' second resentencing did not violate *Miller*

*Miller* recognizes a substantive rule of constitutional law pursuant to the Eighth Amendment that "life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Montgomery*, 136 S. Ct. at 735. As with other substantive constitutional rules, the *Miller* Court left state legislatures with considerable flexibility to develop their own procedures for implementing its substantive holding. We hold that on the record presented, Ramos received an adequate *Miller* hearing at his second resentencing and he has not shown that the SRA, properly applied, so undermines *Miller*'s substantive holding that it is unconstitutional as applied to juvenile homicide offenders.

        a.     As a substantive rule of constitutional law, *Miller* did not impose detailed procedural requirements

*Miller*'s holding involved a somewhat unusual application of the Eighth Amendment. The *Miller* Court stated that it

> does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* [*v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), which bars capital punishment for juvenile offenders,] or *Graham*[, which bars life-without-parole sentences for juvenile nonhomicide offenders]. Instead, it mandates only that a sentencer follow a certain process— considering an offender's youth and attendant characteristics—before imposing a particular penalty.

132 S. Ct. at 2471. This holding generated disagreement as to whether *Miller*'s holding was substantive or procedural. *Montgomery,* 136 S. Ct. at 725, 732. The Supreme Court of the United States recently resolved that question, and its decision informs our analysis of what precisely *Miller* requires of sentencing courts.

The Court held that *Miller* announced a substantive rule that "life without parole [is] an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* at 734 (quoting *Penry v. Lynaugh,* 492 U.S. 302, 330, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989)). It rejected the argument that because *Miller* "has a procedural component," it announced a procedural rule. *Id. Miller*'s procedural requirement for individualized sentencing of juvenile homicide offenders "does not

17

replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735.

Because *Miller* announces a substantive rule, not a procedural one, the Court was "careful to *limit the scope of any attendant procedural requirement* to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." *Id.* (emphasis added). State legislatures are thus allowed some flexibility in fashioning the methods for fulfilling *Miller*'s substantive requirements, so long as the State's approach does not "demean the substantive character of the federal right at issue." *Id.*

To be sure, the fact that state legislatures are given flexibility to define appropriate procedures does not mean that every legislatively enacted procedure will be constitutionally permissible. If a state procedural rule "creates an unacceptable risk" that a substantive constitutional rule will be violated, the procedural rule cannot stand. *Hall v. Florida*, 572 U.S. ___, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014). This was forcefully demonstrated when the Supreme Court recently struck down Florida's procedures for determining when a defendant is intellectually disabled and thus ineligible for capital punishment. Florida law set a rigid, numerical cutoff point, and Florida courts held that any defendant who scored even slightly above that cutoff point on standardized intelligence tests "does

not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited." *Id.* at 1994. This rigid test, which conflicted with the views of medical experts in the field, created an intolerable risk of violating the substantive rule that persons with intellectual disabilities cannot be executed and was therefore held unconstitutional.

Thus, our task is to determine what procedures are necessary to give full effect to *Miller*'s substantive holding, and whether any of the procedures currently imposed by the SRA create an unacceptable risk that a juvenile whose homicide offenses reflect only transient immaturity will be unconstitutionally sentenced to life without parole. The principle guiding our analysis is that "[t]he States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects." *Id.* at 2001.

> b.  *Miller* hearings are always required where a juvenile homicide
>     offender faces life without parole

It is difficult to imagine any reason for an exceptional sentence downward that could be *more* substantial and compelling than the fact that a standard range sentence would be unconstitutional. Therefore, when a juvenile facing a standard range life-without-parole sentence shows that his or her crimes reflect transient immaturity, the juvenile has necessarily proved that substantial and compelling reasons justify an exceptional sentence below the standard range. Moreover,

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Miller* anticipated that life-without-parole sentences for juvenile homicide offenders should be "uncommon." *Miller*, 132 S. Ct. at 2469. Therefore, most juvenile homicide offenders facing the possibility of life without parole will be able to meet their burden of proving an exceptional sentence below the standard range is justified.

Given these principles, it is clear that in order to give effect to *Miller*'s substantive holding, every case where a juvenile offender faces a standard range sentence of life without parole (or its functional equivalent) necessarily requires a *Miller* hearing. The juvenile cannot forfeit his or her right to a *Miller* hearing merely by failing to affirmatively request it, and all doubts should always be resolved in favor of holding a *Miller* hearing.

The required *Miller* hearing is not an ordinary sentencing proceeding. *Miller* "establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered." *Aiken v. Byars*, 410 S.C. 534, 543, 765 S.E.2d 572 (2014). Therefore, a court conducting a *Miller* hearing must do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified.

The court must receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both

20

expert and lay testimony as appropriate. The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 132 S. Ct. at 2468. It is also necessary to consider the juvenile's "family and home environment" and "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." *Id.* And where appropriate, the court should account for "incompetencies associated with youth" that may have had an impact on the proceedings, such as the juvenile's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." *Id.*

When making its decision, the court must be mindful that a life-without-parole sentence is constitutionally prohibited for juvenile homicide offenders whose crimes reflect "'unfortunate yet transient immaturity'" rather than "'irreparable corruption.'" *Id.* at 2469 (quoting *Roper*, 543 U.S. at 573). Moreover, due to "children's diminished culpability and heightened capacity for change . . . appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to the case

21

presented. While formal written findings of fact and conclusions or law are not strictly required, they are always preferable to ensure that the relevant considerations have been made and to facilitate appellate review.

      c.      Ramos has not shown that the specific procedures he suggests are required as a matter of federal constitutional law

Ramos contends several additional procedural protections are required at a *Miller* hearing. He argues that the State must bear the burden of proving that standard range sentencing is appropriate and that the SRA and Washington case law improperly limit the mitigating evidence that a sentencing court may consider. He also argues that a sentencing court must make an explicit finding that the crimes reflect irreparable corruption on the part of the juvenile before imposing life without parole. We agree with Ramos that each of these protections might be highly valuable and worth considering as a matter of policy. However, Ramos has not shown that they are required as a matter of federal constitutional law.

      i.      Requiring the offender to carry the burden of proof for an exceptional sentence downward is constitutionally permissible

At a *Miller* hearing, the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* *Miller* did not, however, specify who carries the burden of proof. Pursuant to the SRA, the offender carries the burden

of proving that an exceptional sentence below the standard range is justified.

Ramos argues that as a matter of constitutional law, the burden must be shifted to

the State to prove that a standard range sentence is appropriate. However, he has

not shown that such burden-shifting is required by the Eighth Amendment.

Ramos reasons that because *Miller* predicted life without parole for juvenile

homicide offenders will be uncommon, such a sentence cannot be presumptive.

Therefore, he argues that the State must carry the burden of proving life without

parole is appropriate in each individual case. We do not question the logical

appeal of this reasoning. However, it attaches a procedural significance to *Miller*'s

holding that the Court expressly disavowed. *Montgomery*, 136 S. Ct. at 735.

Moreover, Ramos has not shown that the SRA's allocation of the burden of

proof creates such an unacceptable risk that juvenile homicide offenders will be

given unconstitutional sentences of life without parole such that the legislative

allocation is constitutionally impermissible. In other contexts where a particular

punishment is categorically impermissible for a particular class of defendants,

courts have held that the defendant may be required to carry the burden of proving

by a preponderance of the evidence that he or she falls within that protected class.

*Commonwealth v. Sanchez*, 614 Pa. 1, 66-77, 36 A.3d 24 (2011) (holding that it is

constitutionally permissible to require defendants to prove that they fall within the

class of people with intellectually disabilities who cannot be subject to capital

23

punishment). Therefore, at this time we cannot hold that the SRA's allocation of the burden of proof for exceptional sentencing is constitutionally impermissible as applied to juvenile homicide offenders.

We also note our legislature's demonstrated and ongoing concern for juvenile justice issues. *See, e.g.*, RCW 9.94A.540(3) (eliminating mandatory minimum sentences for juvenile offenders tried as adults), .730 (expanding parole eligibility for juvenile offenders tried as adults); RCW 10.95.030(3) (creating special sentencing procedures for juvenile offenders convicted of aggravated first degree murder in adult court); *State v. S.J.C.*, 183 Wn.2d 408, 419, 352 P.3d 749 (2015) ("[T]he legislature has always made some provision to limit public access to juvenile court records in recognition of the unique purpose of juvenile courts to rehabilitate and reintegrate youth into society."). Given this history, we are confident in our legislature's ability and willingness to respond to emerging juvenile justice issues in an appropriate manner, accounting for all of the competing interests at stake.

*Miller* does not authorize this court to mandate sentencing procedures that conflict with the SRA unless it is shown that the SRA procedures so undermine *Miller*'s substantive holding that they create an unacceptable risk of unconstitutional sentencing. Ramos has not made this showing as to the SRA's allocation of the burden of proving that an exceptional sentence below the standard

24

range is justified. We thus decline to hold that this allocation is unconstitutional as applied to juvenile homicide offenders.

ii. *Miller* is consistent with Washington law regarding the permissible scope of potential mitigating circumstances

Ramos also argues that Washington law regarding the scope of mitigating evidence that may be considered in deciding whether to impose an exceptional downward sentence imposes a restraint that is inconsistent with *Miller*'s individualized sentencing requirements for juvenile offenders facing life without parole. He reads *Miller* as requiring sentencing courts to consider mitigating evidence of personal factors that are forbidden by RCW 9.94A.340 and this court's holding in *State v. Law*, 154 Wn.2d 85, 110 P.3d 717 (2005). Given the way our court has recently clarified the impact of *Law* with its holding in *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), current Washington law complies with *Miller*.

RCW 9.94A.340 provides that the SRA's "sentencing guidelines and prosecuting standards apply equally to offenders in all parts of the state, without discrimination as to any element that does not relate to the crime or the previous record of the defendant." In *Law*, this court held

that the SRA requires factors that serve as justification for an exceptional sentence to relate to the crime, the defendant's culpability for the crime, or the past criminal record of the defendant. Factors

which are personal and unique to the particular defendant, but unrelated to the crime, are not relevant under the SRA.

154 Wn.2d at 89. Meanwhile, *Miller* holds that before a court can sentence a juvenile offender to life without parole, it must consider the offender's "chronological age and its hallmark features," including "the family and home environment that surrounds" the offender, "the circumstances of the homicide offense, . . . incompetencies associated with youth[,] . . . [and] the possibility of rehabilitation." 132 S. Ct. at 2468.

These different requirements can be reconciled because *Miller* requires a sentencing court to consider the circumstances of youth "in assessing [the offender's] culpability." *Id.* at 2467. *Law* explicitly states that valid mitigating factors may relate to "the defendant's culpability for the crime," 154 Wn.2d at 89, and as this court recently clarified in *O'Dell,* "[i]t is precisely these differences [between juveniles and young adults on one hand and mature adults on the other] that might justify a trial court's finding that youth diminished a defendant's culpability," 183 Wn.2d at 693. Properly applied, Washington law thus allows consideration of factors that might be considered "personal" in a colloquial sense but directly bear on a juvenile offender's culpability, and does not conflict with *Miller.*

26

Ramos' case presents another consideration, however, because he was resentenced for a second time after having spent approximately 20 years in total confinement. The sentencing court received evidence of his maturation and rehabilitation over that time, but in announcing its decision, the court stated,

> While, Mr. Ramos, you may have made great strides in your personal life while incarcerated, the punishment is just. It protects the public, and I hope it sends a message of deterrence and works to protect this public.
>
> I have attempted to restrict my considerations to those authorized by the en banc holding of the Washington State Supreme Court in [*Law*] and in compliance with RCW 9.94A.340 to the extent they do not restrict my consideration of factors under RCW 9.94A.010 on the question of concurrent versus consecutive sentences under RCW 9.94A.535(1)([g]).

2 RP at 175. Ramos contends that the court was required to consider his subsequent rehabilitation in making its sentencing decision, and that the above-quoted language shows it refused to do so.[6]

While a resentencing court may certainly exercise its discretion to consider evidence of subsequent rehabilitation where such evidence is relevant to the circumstances of the crime or the offender's culpability, we decline to hold that the court is constitutionally required to consider such evidence in every case. If it

---

[6] This is a questionable reading of the court's decision. As discussed further below, all of Ramos' proffered mitigation evidence was admitted without objection. The court clearly determined that the evidence of Ramos' subsequent rehabilitation was insufficient to meet his burden of proving that an exceptional sentence downward was justified, but did not clearly refuse to consider that evidence at all.

27

were, the court would be required to consider evidence of a person's subsequent rehabilitation in prison as a basis for an exceptional sentence downward, but it might also be required to consider evidence that the person has *not* demonstrated subsequent rehabilitation as a basis for refusing to impose an exceptional sentence downward. We do not believe *Miller* can be interpreted to require such a result.

*Miller* requires courts to consider the *capacity* for rehabilitation when making an initial sentencing decision about whether a juvenile should be subject to life without parole. 132 S. Ct. at 2468-69 (discussing the reasons a lesser sentence might have been appropriate based on the crimes and the petitioners' backgrounds). However, evidence of *actual* "'demonstrated maturity and rehabilitation'" is generally considered later, when it is time to determine whether a former juvenile offender who is up for parole should be given early release. *Id.* at 2469 (quoting *Graham*, 560 U.S. at 75). Whether such evidence should be considered at the time of resentencing to the extent that it bears on the offender's culpability is a question we leave to the discretion of the trial court in each case.

      iii.    *Miller* does not require an explicit finding that the offenses reflect irreparable corruption

Finally, Ramos contends that the sentencing court must make an explicit finding that the juvenile's homicide offenses reflect irreparable corruption before imposing life without parole. However, the Supreme Court has expressly

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

acknowledged that "*Miller* did *not* require trial courts to make a finding of fact regarding a child's incorrigibility." *Montgomery*, 136 S. Ct. at 735 (emphasis added). Instead, it imposes a substantive requirement that draws "a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Id.* at 734. Just as the Court did not allocate the burden of proof at a *Miller* hearing as a matter of constitutional law, the fact that "this finding is not required . . . speaks only to the degree of procedure *Miller* mandated in order to implement its substantive guarantee." *Id.* at 735. An explicit finding of fact would certainly help to ensure *Miller*'s substantive holding is being implemented, and we encourage sentencing courts to be as detailed and explicit as possible when making their sentencing decisions. However, Ramos has not shown that this particular explicit finding is required as a matter of federal constitutional law.

> d.  Ramos' *Miller* hearing met minimal federal constitutional requirements

Having considered what *Miller* does and does not require, we must now consider the ultimate question of whether Ramos in fact received a *Miller* hearing sufficient to sustain the constitutionality of his de facto life-without-parole sentence. On the record presented, we hold that Ramos' *Miller* hearing at his second resentencing met minimal federal constitutional requirements.

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The State expressly agreed at the outset that Ramos was entitled to a "full resentencing," and the court held a *Miller* hearing that extended over two days. 1 RP at 6. At the hearing, the defense presented lay testimony from Ramos' upholstery teacher and supervisor at Airway Heights Corrections Center, from four of Ramos' family members, and from a man who befriended Ramos in prison, all of whom testified about their good relationships with Ramos, his personal history and lack of other serious disciplinary issues, his positive influence on others, and his good attitude and future prospects. It also presented expert testimony from Dr. Terry Lee, who discussed studies regarding adolescent brain functioning and development. The defense further provided extensive documentary evidence, including social science research, Ramos' records from the Department of Social and Health Service's Division of Juvenile Rehabilitation and the Department of Corrections, written statements from Ramos, and dozens of letters written on Ramos' behalf. Ramos also personally addressed the court, accepting responsibility and expressing remorse for his actions. There was no objection to any of the defense's evidence.

The State presented testimony from a juvenile corrections officer, a sheriff's deputy, and a detective, who all testified about the circumstances of the homicides, including the level of planning beforehand and the events that took place, as well as their recollections of Ramos when they interacted with him in 1993.

When announcing its decision, the sentencing court began by noting that when Ramos was originally sentenced, "the judge and the lawyers held an honest belief that the law required each of these four sentences as violent, serious offenses to run consecutively and that the judge did not have the authority to exercise discretion and run one or more of the sentences concurrently." 2 RP at 167. However, the court stated for the record that it had "discretion to impose concurrent sentences as an exceptional sentence for these serious, violent offenses" in light of *Mulholland*, 161 Wn.2d 322. *Id.*

The court then explained the legal parameters underlying its exercise of discretion as follows:

> The question hinges on whether or not under former RCW 9.94A.120 I find a substantial and compelling reason to justify the exceptional sentence requested by Mr. Ramos.
>
> To determine this I am guided by [former] RCW 9.94A.390(1) [(1990)], and that's the former statute applicable at the time in question, which sets forth the mitigating circumstances. I am also taking into account the adolescent brain science considerations set forth in [*Miller*, 132 S. Ct. 2455, *Graham*, 560 U.S. 48, and *Roper*, 543 U.S. 551], as that relates to subsections [(c)], [(d)], and [(e)][7] of [former] RCW 9.94A.390(1), as well as considerations under the Eighth Amendment of the United States Constitution and the above-

---

[7] The court noted specific facts of the crime that made former RCW 9.94A.390(1)(a), (b), and (f) inapplicable, which were that "none of the four victims initiated this confrontation," that "Ramos did not make any effort to compensate the victims," and that Ramos did not "manifest[ ] extreme caution or sincere concern for the safety or well-being of the victims." 2 RP at 171-72. Former RCW 9.94A.390(1)(h) (applying where "[t]he defendant or the defendant's children suffered a continuing pattern of physical or sexual abuse by the victim") was not discussed, but was clearly not at issue.

31

> mentioned cases, and the corresponding Washington State
> Constitutional protections.

*Id.* at 169.

Regarding adolescent brain science, the court noted that the expert opinions of Dr. Lee, "as well as those referenced by the United States Supreme Court, were general in nature and intended to apply generally to the population of adolescents. . . . Dr. Lee did not render an opinion nor provide testimony individualized to Mr. Ramos." *Id.* at 172-73. The court thus addressed "three significant gaps between juveniles and adults" identified by *Miller* as applied to Ramos specifically. *Id.* at 173.

The court correctly identified those gaps as "'a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk taking'"; the fact that "'[c]hildren are more vulnerable to negative influences and outside pressures and lack the ability to extricate themselves from horrific crime-producing settings'"; and the fact "that a juvenile's actions are less likely to be evidence of irretrievable depravity." *Id.* at 173-74. The court concluded none of the gaps applied here because the murders were "planned" and "not indicative of impulsive acts"; the murder of Bryan Skelton to eliminate him as a witness "evidences to me a clear, cold, calculating decision of a mind fully cognizant of future consequences"; and the murders "were monstrous." *Id.*

Finally, the court turned to "the four penological justifications set forth in [*Miller*] or the stated purposes of Washington Sentencing Reform Act found in former RCW 9.94A.010 [(1981)]."[8] *Id.* at 174. The court noted that "[i]n [*Miller*] the Court was faced with one murder. Here we have four." *Id.* It also noted that "[w]hile these three felony murders may have evidenced the twice-diminished responsibility discussed by the United States Supreme Court in their opinions, the [premeditated] murder of Bryan Skelton did not." *Id.* at 175. The court concluded that "[o]n balance the factors set forth in [RCW] 9.94A.010 lead me to reject the request for concurrent sentences." *Id.* at 174-75.

Although we cannot say that every reasonable judge would necessarily make the same decisions as the court did here, we cannot reweigh the evidence on review. The court clearly received and considered Ramos' extensive mitigation evidence, was fully aware of its authority to impose an exceptional sentence below the standard range, and reasonably considered the issues identified in *Miller* when making its decision. Ramos has not shown that his second resentencing violated *Miller*'s minimal requirements.

---

[8] In additional to the constitutional issues raised by *Miller*, this portion of the court's ruling appears to address former RCW 9.94A.390(1)(g), which provides that it is a mitigating circumstance if "[t]he operation of the multiple offense policy of RCW 9.94A.400 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in RCW 9.94A.010." *See* 2 RP at 176.

33

3.      We decline to engage in an independent state constitutional analysis

Ramos contends that even if the Eighth Amendment does not require the

specific procedural protections he advocates, article I, section 14 of the

Washington Constitution does.  As Ramos correctly notes,

> This Court has "repeated[ly] recogni[zed] that the Washington
> State Constitution's cruel punishment clause often provides greater
> protection than the Eighth Amendment." *State* v. *Roberts*, 142 Wn.2d
> 471, 506, 14 P.3d 713 (2000); Const. art. I, § 14.  This "established
> principle[ ]" requires no analysis under *State v. Gunwall*, 106 Wn.2d
> 54, 720 P.2d 808 (1986). *Id.* at 506 n.11.

Pet. for Review at 16 (first and second alterations in original).  Unfortunately, this

is Ramos' entire argument regarding the Washington Constitution; his analysis

focuses on Eighth Amendment jurisprudence.

Even where it is already established that the Washington Constitution may

provide enhanced protections on a general topic, parties are still required to explain

why enhanced protections are appropriate in specific applications.  *State v. Pugh*,

167 Wn.2d 825, 835, 225 P.3d 892 (2009).  Ramos does not provide any such

explanation and does not address the factors for determining whether a sentence

independently violates the Washington Constitution.[9]  We therefore do not decide

at this time whether article I, section 14 of the Washington Constitution requires

---

[9] These factors are "(1) the nature of the offense; (2) the legislative purpose behind the [relevant] statute; (3) the punishment defendant would have received in other jurisdictions for the same offense; and (4) the punishment meted out for other offenses in the same jurisdiction." *State v. Fain*, 94 Wn.2d 387, 397, 617 P.2d 720 (1980).

34

greater procedural protections than the Eighth Amendment when a juvenile homicide offender faces life without parole.

Amici ask us to hold that a life-without-parole sentence or its equivalent is always unconstitutional as applied to juvenile offenders as a matter of state constitutional law. However, they do not specifically analyze the factors we have established for determining whether a sentence violates the Washington Constitution. Instead, they urge us to follow the lead of the Iowa Supreme Court, which recently "adopt[ed] a categorical rule that juvenile offenders may not be sentenced to life without the possibility of parole under article I, section 17 of the Iowa Constitution." *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016). We do not foreclose the possibility that this court may reach a similar conclusion in a future case, but the briefing here does not adequately explain why we must do so as a matter of Washington constitutional law. We therefore decline to decide the issue at this time.

In conclusion, on this record we hold that the court conducted the individualized sentencing hearing required by *Miller*. It considered the evidence presented and the factors that must be taken into account pursuant to the SRA and the Eighth Amendment, and provided an adequate explanation for its decision. We therefore hold that Ramos' second resentencing complied with *Miller*'s minimal procedural and substantive requirements.

35

C.    The State did not breach the plea agreement

The plea agreement in this case was that the State would recommend Ramos serve the minimum standard range sentence of four consecutive 20-year terms. Ramos contends the State breached that agreement when it noted at Ramos' second resentencing hearing that the murder of 6-year-old Bryan Skelton "would have been a basis for an aggravating sentence" because Ramos "knew or should have known [Bryan] was particularly vulnerable or incapable of resistance due to his extreme youth." 2 RP at 141. Taken in context, this statement did not constitute a breach of the plea agreement.

The State breaches a plea agreement when it "undercut[s] the terms of the agreement explicitly or implicitly by conduct evidencing an intent to circumvent the terms of the plea agreement." *Carreno-Maldonado*, 135 Wn. App. at 83. Even if the State formally recommends a standard range sentence in accordance with the plea agreement, we have observed that "a deputy prosecutor could easily undercut the plea agreement by placing emphasis on the evidence that supports findings that aggravating factors are present." *State v. Talley*, 134 Wn.2d 176, 186, 949 P.2d 358 (1998). Such a breach occurred in *Sledge*, where

> [a]lthough the prosecutor adhered to the recommended disposition from the plea agreement, she insisted on a disposition hearing where she called and vigorously examined a probation counselor and a parole officer on aggravating factors supporting an exceptional disposition based on manifest injustice.

36

133 Wn.2d at 830. That is not the case presented here. The complicated procedural history and evolving underlying law relevant to Ramos' case necessitated a full evidentiary hearing at his second resentencing; the State certainly did not insist on an unnecessary hearing.

Moreover, the judge who presided over Ramos' second resentencing was completely new to the case and needed input from both parties regarding the facts of Ramos' offenses and the state of the applicable law. Particularly, in light of the multiple appellate dispositions of this case over the years, the court asked a number of questions regarding the scope of its authority at Ramos' second resentencing. The court asked both parties "which standard you're asking me or you believe the law requires me to apply in considering the various mitigating factors." 1 RP at 126. It asked the defense "specifically what it is that [Ramos is] asking me to do, not only in terms of running concurrent [sentences], but whether or not you're asking me to go below a standard range." *Id.* at 127. It also asked both parties to "compare and contrast the scope and extent of my discretion under Washington's Sentencing Reform Act as interpreted by [*Law*] compared with the more expansive discretion that the Court would have under the federal Sentencing Reform Act under the United States Supreme Court case of [*Pepper v. United States*, 562 U.S.

37

476, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011)[10]]." *Id.* at 128-29. And the court requested "guidance from both sides tomorrow on the factors you believe I should consider, am allowed to consider legally, and what it is that each side would like me to do in rendering Judgment and Sentence." *Id.* at 129. Neither party asked for clarification of the court's questions, agreeing that they were "pretty clear" and "pretty specific." *Id.*

It is in this context that we must consider the State's remarks the following day:

> And, as the Court's aware, the manner and mechanism of death -- or injury and death was very heinous. This is -- the description that was provided to the Court clearly shows that the people were both bludgeoned to death and then stabbed to death. And in particular the death of Bryan, a six year old, that the defendant admits having committed himself, was particularly heinous.

> And I'd like to point out that that death, you know, would have been a basis for an aggravating sentence. And it's the State position that, you know, that's something you have to look at in terms of, well, okay, there's these mitigating factors. Well, there's also an aggravating factor. *Although, we're not advocating that you give him an aggravated sentence based upon that, I think it's something as part of the crime that the Court can look at.* And in particular that Bryan was a young child that the defendant knew or should have known was particularly vulnerable or incapable of resistance due to his extreme

---

[10] *Pepper* held "that when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." 562 U.S. at 481. However, this decision was based on the Court's interpretation of applicable federal sentencing statutes. *See id.* at 490-93. Ramos does not contend on appeal that *Pepper* should inform our analysis regarding the scope of mitigating evidence that may be considered pursuant to the SRA or that must be considered pursuant to the United States Constitution.

38

youth. And so I think you've got to weigh that in in terms of the type of a crime that was committed.

2 RP at 140-41 (emphasis added). The defense did not object to these statements, and considered in context, it is clear that the State's remarks had both the intention and effect of providing the court a full picture of the facts underlying the offense at issue. It is true that the presence of an aggravating factor does not automatically negate the presence of a mitigating factor, but sentencing decisions must be made in light of the actual facts of the offenses, and the court needed here the parties' input on that issue. *See Miller*, 132 S. Ct. at 2469 n.8.

The State had an obligation to participate in Ramos' second resentencing and ensure the court made a fully informed decision. *Talley*, 134 Wn.2d at 183. It fulfilled this obligation while also fulfilling its obligation pursuant to the plea agreement by repeatedly recommending that the court sentence Ramos to the bottom of the standard range: 20 years for each of the four homicide counts, to run consecutively, for a total of 80 years. And in reaching its decision, the court did not discuss Bryan Skelton's particular vulnerability; it focused on the fact that Bryan was killed "for the stated purpose of eliminating a witness. That evidences to me a clear, cold, calculating decision of a mind fully cognizant of future consequences." 2 RP at 174. Thus, considered in context with a focus "on the

39

effect of the State's actions, not the intent behind them," *Sledge*, 133 Wn.2d at 843 n.7, we hold the State did not breach the plea agreement.

## CONCLUSION

In light of the constantly evolving nature of juvenile justice law, we must take a measured approach to each issue as it arises, giving sufficient deference to legislative judgments and ensuring that we confine our decisions to the merits of the issues presented. Here, the issue presented is whether Ramos' sentence is unconstitutional pursuant to the Eighth Amendment as interpreted by *Miller*. We hold that *Miller* does not impose the specific procedural requirements Ramos suggests, that his second resentencing hearing was at least minimally constitutionally adequate, and that he has not shown that his aggregate 85-year sentence violates the Eighth Amendment. We decline to engage in an independent state constitutional analysis at this time. In light of the full record presented, we also hold the State did not breach the plea agreement. We therefore affirm.

_____ Yu, J

WE CONCUR:

Madsen, J.            Stephens, J.

Johnson, J.            Wiggins, J.

Owens, J.            González, J.

Fairhurst, C.J.            Ellington, J.P.T.