# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52323-0-II |
| Respondent, | |
| v. | |
| KEONTE AMIR SMITH, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Keonte Smith appeals his sentence for second degree human trafficking. Smith argues that the trial court abused its discretion when failing to fully and meaningfully consider his youth as a mitigating factor during sentencing, and the community custody supervision fee, collection fee, and the interest accrual provision on his nonrestitution legal financial obligations (LFOs) should be stricken from his judgment and sentence.

We hold that the trial court considered Smith's youth as a mitigating factor and acted within its discretion when it denied his request for an exceptional sentence downward and affirm his sentence. However, we remand to the trial court to vacate the interest accrual provision on his nonrestitution LFOs from Smith's judgment and sentence.

## FACTS

On November 24, 2016, law enforcement received a complaint regarding an unwanted person in a motel room. Upon their arrival to the motel room, law enforcement found Smith in the room with a handgun next to him. Smith was arrested and placed in detention.

While Smith was in detention, law enforcement reviewed recorded detention phone calls between Smith and his girlfriend, HH. HH met Smith two months prior to Smith's arrest. In several

of the phone calls, Smith and HH discussed prostitution and prostitution-related activities. During multiple phone conversations, HH spoke of "bringing money in" and told Smith about other males who wanted HH to work on their "team." Clerk's Papers (CP) at 186. Smith expressed frustration about HH pairing up with other males. Smith told HH that it was not "safe" to go on hotel dates while he was in detention and that if she needs help, to call his sister or a mutual friend. *Id.* Smith directed HH to put money on his phone account in detention and warned her that she better not be "with someone else." *Id.* at 187. At the time, HH was 16 years old and Smith was 17 years old.

After Smith's arrest, the defense interviewed HH. During the interview, HH stated that she and Smith jointly decided to engage in prostitution when they "decided to make money together." *Id.* at 60. HH explained that Smith would help her set up dates and get hotel rooms. HH kept all the money and would not give any to Smith, although he often would steal some of the money for himself. HH also put some of the money she made on dates on Smith's phone account while he was in detention.

The State charged Smith with second degree human trafficking, promoting commercial sexual abuse of a minor, and second degree unlawful possession of a firearm. The State moved for the juvenile court to decline juvenile jurisdiction pursuant to former RCW 13.40.110(2) (2009). After considering testimony from multiple witnesses, arguments from counsel, and the pleadings, the court granted the State's motion and ordered Smith to be transferred for adult criminal prosecution. Among other considerations, the court noted that the adult court would be required to consider youth as a mitigating factor at sentencing in the event Smith was convicted.

Smith pleaded guilty to second degree human trafficking and the State dropped all other charges.

The trial court calculated Smith's offender score as 2.5. Based on that offender score, Smith faced a standard range sentence of 111 to 147 months of incarceration and 18 months of community custody. Smith requested an exceptional sentence of 36 months of incarceration followed by 18 months of community custody. In juvenile court, second degree human trafficking carries of sentence of 103 to 129 weeks of confinement.

Smith submitted a 75 page sentencing memorandum to the court. In his sentencing memorandum, Smith highlighted revisions to the Juvenile Justice Act that took effect in June 2018, less than a year after Smith was denied juvenile jurisdiction.[1] The legislature revised the act to eliminate the crime of second degree human trafficking as a basis for declining juvenile jurisdiction to a respondent. Smith argued that the change supported an exceptional sentence aligned with a sentence Smith would be facing if sentenced in juvenile court.

Also in his sentencing memorandum, Smith provided information about his upbringing. Throughout his childhood, Smith's father was in and out of jail. His mother used drugs extensively and drank heavily. His mother often left Smith with others or would abandon him with strangers. Smith witnessed his father abuse his mother starting at a young age. Smith remembers his father stuffing a sock into his mother's mouth and beating her when he was a toddler. Smith frequently witnessed his father beat his mother with his fists, a belt, or other objects. His mother was often

---

[1] Under former RCW 13.40.110(2)(a) (2009), a decline hearing was mandatory if a juvenile defendant was charged with a class A felony. Second degree human trafficking is a class A felony. RCW 9A.40.100(3)(b). The statute was revised by *Laws of* 2018 ch. 162, § 4. The revised version omits this requirement, but came into effect in June 2018. *See* former RCW 13.40.110(2) (2018). The State moved for the court to decline juvenile jurisdiction in September 2017.

hospitalized, and his father was often arrested for these assaults. Smith stated he frequently has nightmares about the violence.

Smith's childhood worsened when he was 12 years old. Smith's father took Smith and his older brother to a lake to swim after his parents got into an argument. Smith could not swim, but remembers watching others frantically search for his brother in the lake after his brother was heard screaming for help and seen flailing his arms. Their efforts were unsuccessful. Smith remembers watching a rescue team bring his brother's body out of the water 45 minutes later. Smith expressed how he suffers daily trauma from this event, including nightmares of how his brother looked when the rescue team pulled his body from the water.

After this incident, Smith became depressed and anxious. He started doing poorly in school and he dropped out of his sports teams. Smith described becoming less social and getting into trouble more often. Less than six months after his brother's death, Smith was arrested for his first offense at age 13. Smith has been in and out of custody ever since.

Also, after his brother's death, Smith's father moved out of the home. His mother moved another man into the home, who was a known drug dealer and former pimp. He would give Smith drugs to sell so that Smith could earn his own money. Smith started using marijuana in sixth grade; by ninth grade, Smith used marijuana, Xanax, and alcohol on a daily basis.

Smith presented a forensic assessment by Dr. Ronald Roesch, a clinical psychologist, for consideration by the court during sentencing. Smith had "very high scores on the Anxiety and Depression scales." *Id.* at 141. Roesch concluded that Smith was a low to moderate risk for recidivism and low risk for future violent behavior. The factors that elevated these risks were not in Smith's control, which included his unstable and abusive home life, negative adult role models,

and lack of social support network, which forced Smith to leave his home to survive at an early age. Roesch also noted that Smith had a low risk for violent behavior because prior to his arrest, Smith did not have a history of violent behaviors or anger issues.

Roesch concluded that Smith's level of maturity and sophistication was lower than other youth offenders. He noted that young individuals with Smith's maturity and sophistication "have a diminished capacity for judgment, do not tend to weigh the costs and benefits of a given behavior before acting, and do not fully understand the consequences of their actions." *Id.* at 144.

> [Smith] did not have at the time of his arrest, sufficient sophistication or maturity to function autonomously. His scores on the Sophistication-Maturity scale described earlier in this report indicated that he had difficulty appreciating the long-term consequences of decisions, was less capable of imagining risky consequences of decisions, and more likely to only consider only a restricted number and range of consequences. In terms of his involvement in the behavior that led to his charge of human trafficking, it does not appear that he perceived the magnitude or the long-term consequences of this offense. Indeed, it appears that he may not have grasped that what he was doing was wrong, either morally or criminally. As noted earlier in this report, [Smith] said "it never crossed my mind that I could get in big trouble. I didn't think of the consequences." He told me "I didn't think I could get arrested for what I was doing. I didn't know there were charges for that." Certainly, ignorance of the law is not an excuse for engaging in this criminal act, but his thinking does reflect his lack of maturity and sophistication. A review of the telephone calls he made from detention reflects this lack of appreciation. He was aware his calls were monitored yet he did not try to be discrete in discussing the acts of prostitution with H.H.

*Id.* at 145-46.

Roesch also explained Smith's low maturity and sophistication level as related to his cognitive development.

> In my clinical opinion, although [Smith] was living what appeared to be an adult lifestyle when he was arrested at age 16, he did not have the maturity and cognitive development to appreciate the choices he was making. He was clearly engaged in a delinquent lifestyle, and had been since age 13. This type of lifestyle is virtually all he learned through the adults in his life. . . . As the research on brain development clearly shows, [Smith's] capacities for reasoned decision making and controlling

his impulses were not developed during his teen years prior to his arrest. He was also using drugs quite heavily, which I expect was further clouding his judgment about his life choices.

*Id.* at 146.

The assessment also concluded that Smith scored above most young offenders in amenability to treatment. Roesch submitted that Smith "is certainly amenable to treatment, as indicated by his scores on the Treatment Amenability scale . . . and his participation in treatment since he has been in detention. He has a number of problems that would benefit from treatment but his problems are not particularly difficult to treat." *Id.* at 146.

The court heard arguments from counsel. Smith's counsel largely summarized and reiterated the information provided in Smith's sentencing memorandum. The prosecutor summarized Smith's criminal history and asked the court to impose a standard range sentence, arguing that Smith was getting older and more violent. The prosecutor also argued that the court should decline Smith's request for an exceptional sentence because the State already factored in Smith's youth when the State dismissed Smith's other charges as part of the plea deal. The prosecutor recommended a sentence of 111 months, the bottom of the sentencing range.

In its oral ruling, the court stated that it read Smith's sentencing memorandum and that "to the extent that anybody is reviewing this decision at some later date, I have considered all of it." Verbatim Report of Proceedings (VRP) (Aug. 2, 2018) at 35. The court acknowledged its duty to consider Smith's youth. The court expressed concern that this was the second time Smith had been charged with possession of a firearm. Smith had pleaded guilty to possession of a firearm and served 98 days in detention in 2015. The court stated that the possession of a firearm charge

speaks to a number of issues including, you know, whether this is something that -- you know, when they talk about juvenile and brain development and impulsivity

and all of that, it's not -- it's me looking at this criminal act but certainly looking at his behavior over time as well. This is not somebody just engaging in something where they had an error in judgment one time, made a mistake; the Court should take that into consideration.

*Id.* at 37.

The court stated that it would take into consideration the fact that the State dropped charges due to Smith's youth when making a plea deal. The court further stated,

Throughout all of these documents, I didn't really hear and I don't really believe, honestly, a credibility issue; that Mr. Smith didn't understand that possessing a firearm was against the law since he previously had been charged with it, and I don't believe that he thought that prostitution was not against the law. He may not have appreciated the full ramifications of that, how serious it was or what the extent of the sentencing might be. And why I get to that conclusion is in part because of something that I read about the phone calls, listening to the phone calls, that he was on a recorded line, but didn't appreciate that someone could listen to it and, therefore, it could result in charges. You know, we have adults in here all the time who know that their calls are being recorded. . . . So I don't think, quite frankly, I'm not persuaded that that is something that is just because of youthfulness…. [T]hey're aware that it's being recorded. I think he was aware that prostitution is illegal, maybe didn't fully appreciate how serious it was, but . . . there's nothing about this that suggests to me that he did not understand or appreciate the wrongfulness of his conduct.

*Id.* at 38-39. The court found that HH was the ultimate victim and was injured by Smith's criminal acts.

The court was unpersuaded that Smith should receive an exceptional sentence. The court sentenced Smith to 111 months confinement followed by 18 months of community custody, a sentence within the standard range. The court found that Smith was indigent and waived discretionary LFOs. The court imposed a collection fee, the interest accrual provision, and community custody supervision fees as determined by the Department of Corrections.

Smith appeals his sentence.

DISCUSSION

## I. YOUTH AS A MITIGATING FACTOR

Smith argues that the trial court abused its discretion by failing to fully and meaningfully consider Smith's youth as a mitigating factor when it determined that Smith's youth did not justify an exceptional sentence. We disagree.

### A. LEGAL PRINCIPLES

In general, a party cannot appeal a sentence within the standard range. *State v. Osman*, 157 Wn.2d 474, 481, 139 P.3d 334 (2006). "However, a defendant may appeal the process by which a trial court imposes a sentence." *In re Pers. Restraint of Marshall*, 10 Wn. App. 2d 626, 635, 455 P.3d 1163 (2019) (emphasis omitted). By challenging the process, a defendant challenges the trial court's refusal to exercise its discretion or the legal conclusions and determinations that form the basis of the court's refusal to impose an exceptional sentence. *Id.* (quoting *State v. Ramos*, 187 Wn.2d 420, 433, 387 P.3d 650 (2017)). "While no defendant is entitled to an exceptional sentence below the standard range, every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered." *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005) (emphasis omitted). Therefore, remand is the appropriate remedy when a trial court imposes a sentence without meaningfully considering an authorized mitigated sentence. *Id.* at 342-43.

Under the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, a court may impose a sentence outside the standard sentence range for an offense if it finds "that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535 (2016). A sentencing court must find that the mitigating circumstances that justify a sentence below the standard range

are established by a preponderance of evidence. *Ramos*, 187 Wn.2d at 434. One of the possible factors that a sentencing court may use to justify an exceptional downward sentence is a defendant's youth. *State v. O'Dell*, 183 Wn.2d 680, 689, 358 P.3d 359 (2015).

Courts have "an affirmative duty to ensure that proper consideration is given to the juvenile's 'chronological age and its hallmark features.'" *Ramos*, 187 Wn.2d at 443 (quoting *Miller v. Alabama*, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)). Those features include (1) mitigating circumstances of youth, including the juvenile's "'immaturity, impetuosity, and failure to appreciate risks and consequences'"; (2) the juvenile's environment and family circumstances, the juvenile's participation in the crime, or the effect of familial and peer pressure; and (3) how youth impacts any legal defense, as well as any factors suggesting that the child might be rehabilitated. *State v. Houston-Sconiers*, 188 Wn.2d 1, 23, 391 P.3d 409 (2017) (quoting *Miller*, 567 U.S. at 477).

Courts are required to consider these differences during sentencing in order to comply with the Eighth Amendment. *Id*. at 19. When doing so, courts must "fully and meaningfully" inquire into the individual circumstances of the particular juvenile offender. *State v. Solis-Diaz*, 194 Wn. App. 129, 141, 376 P.3d 458 (2016) (citing *O'Dell*, 183 Wn.2d at 696), *rev'd in part on other grounds*, 187 Wn.2d 535, 387 P.3d 703 (2017). However, "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence." *O'Dell*, 183 Wn.2d at 695. Trial courts retain full discretion when considering the imposition of an exceptional sentence based on mitigating circumstances associated with youth. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 314, 440 P.3d 978 (2019).

B. ANALYSIS

Smith relies on *State v. Delbosque*, 6 Wn. App. 2d 407, 430 P.3d 1153 (2018), *rev'd in part on other grounds,* 195 Wn.2d 106, 456 P.3d 806 (2020), in support of his claim that the trial court did not meaningfully consider his request for an exceptional sentence. Delbosque committed aggravated first degree murder in 1993 when he was 17 years old and received a mandatory sentence of life in prison without parole. *Id*. at 410. Following a resentencing hearing pursuant to the *Miller*-fix statute[2] in 2016, the trial court sentenced Delbosque to a minimum term of 48 years. *Id*. at 410, 412. The court stated that it considered the appropriate factors but determined that Delbosque's attitude toward others was "reflective of the underlying crime," and that the crime "was not symptomatic of transient immaturity, but has proven over time to be a reflection of irreparable corruption, permanent incorrigibility, and irretrievable depravity." *Id*. at 416-18.

On appeal, Delbosque successfully argued that insufficient evidence supported the trial court's findings, and the Supreme Court affirmed. *Delbosque*, 195 Wn.2d at 120. The Supreme Court reiterated that when considering a defendant's youth at a *Miller* hearing, a sentencing court "'must *meaningfully* consider how juveniles are different from adults.'" *Id*. at 121 (alteration from original) (quoting *Ramos*, 187 Wn.2d at 434).

---

[2] Following *Miller*, the Legislature enacted RCW 10.95.030(3)(b), which provides in relevant part,

> In setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

*Delbosque* is distinguishable from Smith's case. First, Smith was not sentenced following a *Miller* hearing. We recognize that trial courts, whether conducting a resentencing hearing pursuant to the *Miller*-fix statute or an ordinary sentencing proceeding, have the affirmative duty to address the differences between adults and youths, and to "fully and meaningfully" inquire into the individual circumstances of the particular juvenile offender. *Solis-Diaz*, 194 Wn. App. at 141 (citing *O'Dell*, 183 Wn.2d at 696); *see also Houston-Sconiers*, 188 Wn.2d at 19; *Ramos*, 187 Wn.2d at 434. Based on our guidance from the Supreme Court, *Miller* hearings involve the heightened scrutiny that accompanies the sentencing of juveniles under RCW 10.95.030. *See State v. Gilbert*, 193 Wn.2d 169, 176, 438 P.3d 133 (2019) (When conducting a resentencing hearing under the *Miller*-fix statute, the court must "tak[e] care to thoroughly explain its reasoning."); *see also Ramos*, 187 Wn.2d at 443 ("[A] court conducting a *Miller* hearing must do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified."). Our Supreme Court has not extended the level of scrutiny required at a *Miller* hearing to a standard sentencing hearing.

Second, Smith did not assign error to any finding made by the trial court or contend that any finding made by the trial court was not supported by substantial evidence. As such, the factual findings are verities on appeal. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Without challenging the trial court's findings for lack of substantial evidence, our inquiry is limited to whether the court categorically refused to consider Smith's youth or relied on an impermissible basis when denying his request for an exceptional sentence. *See Marshall*, 10 Wn. App. 2d at 635 (quoting *Ramos*, 187 Wn.2d at 433). Here, Smith alleges that the trial court abused its discretion by failing to even consider the evidence he presented before deciding against imposing an

11

exceptional sentence. We disagree with Smith and hold that the trial court properly exercised its discretion.

At Smith's sentencing hearing, the court heard extensive argument from counsel. Before imposing Smith's sentence, the trial court stated that it was "not going to address everything," but it fully reviewed and considered Smith's lengthy sentencing memorandum and his mitigating evidence. VRP (Aug. 2, 2018) at 35. The trial court also confirmed that it was familiar with *Houston-Sconiers* and its duty to consider Smith's age as a potential mitigating factor.

The trial court's ruling referenced juvenile brain development and impulsivity. The court noted that Smith had previously been convicted of possession of a firearm. As a result, the court stated that the offense at issue was not an isolated mistake or a one-time lapse in judgment, and therefore consideration of possible impulsivity on Smith's part did not weigh in favor of an exceptional sentence. The court also found that Smith understood that possession of a firearm and prostitution were against the law, but that Smith "may not have appreciated the full ramifications of that, how serious it was or what the extent of the sentencing might be." *Id.* at 39. Last, the court found that Smith's potential inability to understand the seriousness and the consequences of his actions did not diminish his culpability to the point that an exceptional sentence should be imposed. Ultimately, the court was not persuaded that the evidence Smith presented warranted a departure from the standard range.

The record demonstrates that the trial court did not exceed the limits of its considerable discretion in imposing a standard range sentence. The court stated on the record that it fully considered the evidence Smith submitted, and it heard extensive argument from Smith. The court was well apprised of the law and aware of its duty to consider youth as a mitigating factor at

sentencing. Although Smith takes issue with the court's ruling, his criticisms ultimately go to the *decision* the court reached rather than the manner in which the court exercised its discretion. We are mindful of the concerns expressed by the dissent about the harshness of Smith's sentence. The sentence he received stands in stark contrast to the sentence he would have received had he been prosecuted in juvenile court under the current version of the decline statutes. RCW 13.40.110; RCW 9.94A.030(47). However, our inquiry on appeal is not whether we agree with the judgment of the trial court, but whether the trial court refused to exercise its discretion at all or relied on an impermissible basis for refusing to impose an exceptional sentence. *State v. Khanteechit*, 101 Wn. App. 137, 140, 5 P.3d 727 (2000). Accordingly, we conclude that the trial court acted within its discretion when it imposed a low-end standard range sentence.

We hold that because the court did not abuse its discretion, Smith may not appeal his standard range sentence.

## II. LEGAL FINANCIAL OBLIGATIONS

Smith argues that the trial court erred when imposing the collection fee, the community custody supervision fee, and the interest accrual provision because he is indigent. We agree with Smith as it relates to the nonrestitution interest accrual provision. We disagree with Smith as it relates to the supervision fee and collection fee because they are not costs under RCW 10.01.160(2). However, because this matter will be remanded to address the interest accrual provision, the trial court is permitted on remand to reconsider imposition of these discretionary LFOs.

Smith argues that the interest accrual provision for nonrestitution LFOs should be stricken because the provision is no longer authorized by statute. The trial court imposed interest on the

13

nonrestitution LFOs from the date of judgment, August 2, 2018. But RCW 10.82.090(1) now provides that as of June 7, 2018, "no interest shall accrue on nonrestitution [LFOs]." The amended version of RCW 10.82.090(1) applies to Smith because he was sentenced after June 7, 2018. Because the statute now prohibits interest on nonrestitution LFOs, the interest accrual provision in Smith's judgment and sentence must be stricken. RCW 10.82.090(1).

Smith also argues that the community custody supervision fee and collection fee should not be imposed on him as an indigent defendant because they are discretionary LFOs. "House Bill 1783 amend[ed] the discretionary LFO statute, former RCW 10.01.160, to prohibit courts from imposing discretionary costs on a defendant who is indigent at the time of sentencing." *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). While neither the supervision fee nor the collection fee are considered a "cost" under RCW 10.01.160(2), we encourage the trial court to reconsider the imposition of these fees on remand in light of *Ramirez. See State v. Clark*, 191 Wn. App. 369, 376, 362 P.3d 309 (2015).[3]

---

[3] Smith also argues that we should reassign his case to a different judge on remand to preserve the appearance of fairness because whether to impose an exceptional sentence is entirely discretionary. Because we hold that the trial court properly considered Smith's sentencing request, the court will not be asked to exercise its discretion on remand. Therefore, we do not address his argument and deny his request for reassignment on remand.

CONCLUSION

We affirm Smith's standard range sentence, but we remand to the trial court to strike the nonrestitution interest accrual provision from Smith's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
CRUSER, J.

I concur:

_____
MAXA, P.J.

GLASGOW, J. (dissenting in part)—Keonte Amir Smith was 16 years old when he committed second degree human trafficking. He helped set up "hotel dates" that his 16-year-old girlfriend, HH, was going on, and he shared proceeds from these dates. Clerk's Papers (CP) at 186. Smith did not use force or intimidation to commit this crime. Smith stole money from HH at least once while she was asleep, but otherwise she said that they worked together.

Smith pleaded guilty only to second degree human trafficking. Nevertheless, at sentencing, the trial court focused on his charge of possession of a firearm, concluding that this charge indicated his criminal behavior was escalating, even though there was no evidence that Smith had used force or violence or had any history of violence. The trial court also focused on its assessment of whether Smith knew that his actions were illegal, concluding that because this was not his first offense, his crime could not be attributed to the impulsivity of youth.

As the majority succinctly explains, in order to comply with the Eighth Amendment, a court at sentencing has "an affirmative duty to ensure that proper consideration is given to the juvenile's 'chronological age and its hallmark features.'" *State v. Ramos*, 187 Wn.2d 420, 443, 387 P.3d 650 (2017) (quoting *Miller v. Alabama*, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)). A sentencing court must consider: (1) mitigating circumstances of youth, including the juvenile's "'immaturity, impetuosity, and failure to appreciate risks and consequences;'" (2) the juvenile's environment and family circumstances, the juvenile's participation in the crime, or the effect of familial and peer pressure; and (3) how youth impacted any legal defense, as well as any factors suggesting that the child might be rehabilitated. *State v. Houston-Sconiers*, 188 Wn.2d 1, 23, 391 P.3d 409 (2017) (quoting *Miller*, 567 U.S. at 477).

Significantly, a court that is sentencing a juvenile must "fully and meaningfully consider" the individual circumstances of the particular juvenile offender. *State v. Solis-Diaz*, 194 Wn. App. 129, 141, 376 P.3d 458 (2016) (citing *State v. O'Dell*, 183 Wn.2d 680, 696, 358 P.3d 359 (2015)), *rev'd in part on other grounds*, 187 Wn.2d 535, 387 P.3d 703 (2017). Here, the trial court expressly discussed only the first *Houston-Sconiers* factor and otherwise simply stated that it had "considered" Smith's sentencing memorandum and counsel's arguments at the hearing, pointing out that "it's 4:00." Verbatim Report of Proceedings (Aug. 2, 2018) (VRP) at 35. This lack of discussion leaves this court unable to determine whether the *Houston-Sconiers* factors were *meaningfully* considered.

When discussing the first factor, the trial court did not mention or address Dr. Ronald Roesch's conclusion that Smith's youth and lack of maturity would have caused him to fail to appreciate the consequences of his crime, including the potential impacts on his girlfriend.

More importantly, the latter *Houston-Sconiers* factors were significant here, but the trial court seems to have ignored them. As the majority explains, Smith's environment and family circumstances were remarkably difficult and this likely had a significant impact on his ability to engage in good decision-making as a teenager. Smith's father was in and out of jail and prison for assaulting his mother, while his mother consistently drank heavily and used drugs. His mother's boyfriend actively encouraged Smith to sell drugs. The important adults in Smith's life modeled only criminal activity and poor decision-making.

In addition, Smith suffered significant and complex trauma as a child, something the trial court did not even acknowledge when explaining its sentencing decision. As a toddler, he witnessed his father violently assault his mother, and these assaults continued throughout his

17

childhood. Smith witnessed the immediate aftermath of his brother's sudden death. It was shortly after this tragedy that Smith started getting onto trouble.

It is remarkable that Smith has avoided becoming violent, despite his family history. Dr. Roesch explained that Smith "is certainly amenable to treatment, as indicated by his scores on the Treatment Amenability scale . . . and his participation in treatment since he has been in detention. He has a number of problems that would benefit from treatment but his problems are not particularly difficult to treat." CP at 146. A structured risk assessment showed a low to moderate risk to reoffend and a low risk of violent behavior in the future. The trial court did not discuss at sentencing the chances that Smith could be rehabilitated or his capacity for change.[4]

I recognize that no appellate court has yet required that sentencing judges discuss each *Houston-Sconiers* factor on the record when sentencing a juvenile in adult court. And I recognize that the trial court here said on the record that it had "considered" all of the information provided to it. VRP at 35. But it sentenced a child to almost 10 years in prison for a nonviolent crime—a child with no history of violence at all—without mentioning his significant childhood trauma or an expert's assessment that he was amenable to treatment, making rehabilitation possible. Absent some discussion on the record, I do not know how we can evaluate whether the trial court fulfilled its duty to *meaningfully* consider the *Houston-Sconiers* factors, where the trial court failed to even mention two-thirds of the factors. Smith's family circumstances, history of trauma, and prospects for rehabilitation were arguably the most significant factors at play in Smith's sentencing.

---

[4] Had Smith's case been adjudicated in juvenile court, something that would now be required under the current version of the decline statutes, he would have been sentenced to less than three years. RCW 13.40.110; RCW 9.94A.030(47).

As a result, I would remand for meaningful consideration of the remaining *Houston-Sconiers* factors on the record and resentencing if warranted. I respectfully dissent.

_____
Glasgow, J.