# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55269-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| D'ANTHONY LESLIE WILLIAMS, | |
| Appellant. | |

MAXA, P.J. – D'Anthony Williams appeals his convictions following a jury trial for first degree premeditated murder, first degree robbery, first degree unlawful possession of a firearm, and unlawful possession of a controlled substance (methamphetamine). He also appeals his sentence for first degree premeditated murder. The convictions arose from an incident in which Williams shot and killed a convenience store clerk during a robbery. Williams's trial was conducted in a closed courtroom because of COVID-19 concerns, but the trial was streamed to the public on YouTube, was accessible via Zoom, and possibly was broadcast on local television to accommodate public trial right concerns.

We hold that (1) even though YouTube briefly stopped streaming when the trial court and the parties questioned a prospective juror, the record is insufficient for Williams to prove a public trial violation; (2) the trial court did not err in admitting testimony from a firearm expert about his observations after viewing the surveillance video of the murder; (3) Williams is entitled to be resentenced on the first degree premeditated murder conviction because the trial court

failed to adequately consider the attributes of his youthfulness as required under *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021); and (4) Williams's conviction for possession of a controlled substance must be vacated and dismissed with prejudice under *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021).

Accordingly, we affirm Williams's first degree premeditated murder, first degree robbery and first degree unlawful possession of firearm convictions, but we remand for the trial court to vacate and dismiss with prejudice his unlawful possession of a controlled substance conviction and to resentence him on all remaining convictions.

FACTS

*Background*

Williams shot and killed a store clerk while robbing a convenience store in Kelso. Law enforcement arrested Williams in connection with the robbery and shooting. In a search incident to the arrest, officers found methamphetamine in a bag in Williams's sock.

The State charged Williams with first degree premeditated murder with a firearm sentencing enhancement, first degree felony murder with a firearm sentencing enhancement, first degree robbery with a firearm sentencing enhancement, first degree unlawful possession of a firearm, second degree taking a motor vehicle without permission, and unlawful possession of a controlled substance (methamphetamine). Williams was 19 years old at the time of these crimes.

*Cowlitz County Administrative Order Regarding Trials During COVID-19*

In July 2020, the presiding judge of the Cowlitz County Superior Court entered an administrative order in a matter captioned "Superior Court Courtroom Proceedings Held in a Virtual Courtroom." Br. of Resp't, App. 2 at 1. The order stated as follows:

> 1. A compelling interest has been demonstrated by the ongoing health crisis that requires the Court to conduct hearings by virtual technology (ZOOM platform) and

to limit physical public interaction between the parties, public and staff in accordance with the guidelines of the CDC and local health department.

2. Any person that objects to a currently scheduled matter being heard in this manner may telephone into the virtual courtroom hearing and request to be heard by the Court. Contact information can be found on the Cowlitz County Superior Court website (http://cowlitzsuperiorcourt.us/). When the Court grants permission to speak, the person shall then state their objection.
. . .

4. The Court finds the means provided for the public to observe and listen to virtual court hearings is the least restrictive means available for protecting the public, the parties, and the court staff. Specifically, *any party can hear and observe the proceedings by logging into the ZOOM hearing; the information to log in to Superior Court ZOOM hearings can be found on the Cowlitz County Superior Court website* (https://cowlitzsuperiorcourt.us/). All Superior Court hearings, unless prohibited by law, *will be live streamed on YouTube for the general public to observe any and all proceedings* pursuant to State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995). This order will also extend to jury trials held at the Cowlitz County Expo Center. Links to every courtroom, except Juvenile Court, and including the Expo Center can be found on the Cowlitz County Superior Court website (https://cowlitzsuperiorcourt.us/). *Where possible, jury trials held when this Order is in effect will also be televised through Kelso Longview Television (KLTV).*

5. The Court has weighed the importance of open proceedings against the present health risks and has determined that it is appropriate to defer to the guidance of the public health experts during this pandemic. The risk of further spread of COVID-19 outweighs the public's interest to be physically present in an open court at this time.

Br. of Resp't, App. 2 at 2-3 (emphasis added).

Williams's trial took place in November 2020. At the beginning of the trial, the trial court told the parties and counsel, "[T]he process that's been developed for this courtroom is that the public is excluded from being in the courtroom. *All proceedings are broadcast on YouTube*, so that the public has full access to the proceedings." 1 Report of Proceedings (RP) at 59 (emphasis added).

In preliminary remarks to the jury venire, the trial court stated,

3

> Normally court proceedings are open to the public. Throughout this trial, nobody from the public will come through that door. It will be court personnel, witnesses and the jurors. The reason for that is we just - - we start violating all those social distance rules as soon as we do that. To make this case still open to the public *the proceedings are being broadcast through Zoom and over YouTube*. So, anybody who wants to watch the trial can do so with the touch of a button. All these proceedings are going to be recorded on cameras that are placed all over the room.

1 RP at 180 (emphasis added). Members of the media also attended part of the trial.

*Excusal of Juror No. 25*

While prospective jurors were completing questionnaires, the bailiff advised the trial court that juror 25 was extremely distraught. Juror 25 had told the bailiff that she had two children in prison and did not feel like she could participate. The State had no objection to excusing juror 25. Williams' attorney stated that he had some concerns about excusing the juror without knowing more and talking to her.

While inquiring about the other prospective jurors, the trial court stated, "Michelle[1] says she is looking at YouTube and we are not streaming." 1 RP at 61. The trial court then requested that juror 25 be brought into the courtroom. While waiting for juror 25, the trial court again noted that Michelle had informed him that the proceedings were not streaming.

Juror 25 then entered the courtroom, and the trial court placed her under oath. The court asked about her concerns about sitting on the jury. She said that both of her sons had gone to prison and that she was experiencing a lot of anxiety about being at the court. Juror 25 began crying. The trial court noted that Juror 25 was emotional and asked if that would make it difficult or impossible to sit fairly as a juror. Juror 25 said that she did not feel comfortable and did not know if she would be the best person to make decisions. The trial court then asked if either of the attorneys had questions for juror 25, and both attorneys responded that they did not.

---

[1] The record does not further identify "Michelle."

4

The State said it had no objection to dismissing juror 25 and noted that the jury did not yet know what the charges were. Williams's attorney agreed that the court could excuse juror 25 for cause. The trial court again noted that juror 25 was very emotional even before knowing the nature of the charges, and the court dismissed her for cause.

Williams's attorney then stated that he checked the Zoom/YouTube stream on his phone and "[i]t did not appear [indiscernible] there is no content." 1 RP at 64. The trial court responded that an information technology employee was on the way. The trial court then recessed while the prospective jurors filled out the questionnaire. Upon reconvening, the trial court asked "if somebody who is capable would check their phone and make sure the streaming is now going, just to be certain." 1 RP at 65.

*Trial Evidence*

The jury viewed videos from the surveillance cameras at the convenience store. The videos showed a man entering the store with a handgun in his right hand, motioning with the gun, pointing the gun at the store clerk, and then shooting her.

The State called sergeant Kirk Wiper of the Kelso Police Department as an expert witness to testify about firearms operations. Defense counsel told the trial court that he anticipated objecting to Wiper's testimony because it would be improper for Wiper to give an opinion that the man in the video intended to fire the gun. The trial court ruled that Wiper could testify about the firearm mechanisms but prohibited testimony regarding the mindset of the man in the video or whether the man was or was not anticipating something. The court stated that, with the proper foundation, Wiper could testify that the movement of the gun was consistent with anticipation of recoil. The court also reiterated that Wiper could not testify as to what the person in the video was or was not thinking or anticipating.

The State asked Wiper about recoil, and he explained that recoil is the disruption of a gun as it is fired. Wiper testified that when a gun is fired, the gun generally recoils upward. He explained that, because humans tend to brace themselves against an impact, they might show anticipation of recoil by moving a gun in a certain way to brace their body against the gun firing. Wiper stated that a right-handed person anticipating recoil generally moves the gun downward and to the left.

The State then played one of the surveillance videos and advanced the video frame by frame. The State asked what the gun's position was consistent with, and Wiper answered "[a]nticipation of a recoil." 2 RP at 617. The trial court overruled Williams's objection. Wiper then testified that several actions in the video were consistent with movement associated with steeling or bracing against an explosion that occurs when someone fires a firearm and anticipation of recoil.

*Verdict and Sentencing*

The jury found Williams guilty of first degree premeditated murder, first degree felony murder, first degree robbery, first degree unlawful possession of a firearm, and unlawful possession of a controlled substance (methamphetamine).[2] The jury also found that two aggravated circumstances applied to the first degree premeditated murder verdict: (1) Williams committed the murder to conceal the commission of a crime or protect or conceal the identity of any person committing a crime; and (2) the murder was committed in the course of, in furtherance of, or in immediate flight from first degree robbery. Finally, the jury found that

---

[2] The trial court vacated the first degree felony murder conviction because Williams was convicted of the greater offense of first degree premeditated murder.

Williams was armed with a firearm during the commission of the first degree premeditated murder, first degree felony murder, and first degree robbery.

At sentencing, the State argued that Williams should receive a mandatory sentence of life in prison without the possibility of parole. Defense counsel acknowledged that the sentence for Williams's most serious offense was life without parole, and there were no alternatives and no ranges. Defense counsel did note that Williams was 20 years old and that the sentence would send him to prison for the rest of his life. Defense counsel concluded his argument by stating that nothing he said would have an impact on Williams' sentence, "but I would not be doing my job if I didn't remind everyone that he is also a person, a human being, capable of redemption. Unfortunately, Court's discretion is limited, and that is going to come during the course of the rest of his life in prison." 3 RP at 1129.

The trial court noted that "Williams was obviously very young, 19 at the time of this crime." 3 RP at 1130. The court also noted that Williams had taken three prior trips to the juvenile institution for various offenses. The court stated that Williams "displayed a truly, extraordinary disregard for life – for the consequences of [his] actions, that is emblematic both of a juvenile mind, an undeveloped mind, and also of the worst kind of sociopath. I don't know where you fall in there." 3 RP at 1130. Following these statements, the court stated,

> Our Supreme Court has recently made clear that I can and should consider a Defendant's youth in sentencing, and that it is a basis for an exceptional sentence downward. I've given substantial consideration to that factor; but, given the circumstances of this crime, I don't see that that creates any basis for me to find any lesser degree of culpability or responsibility on your part.
>
> It is unclear to me if I am permitted to mitigate a sentence of life without parole. But, to make clear, assuming I have that authority, I choose not to exercise it in this case.
>
> I think the sentence of life without parole on Count I is an appropriate one. I will impose that sentence.

7

3 RP at 1130-31.[3]

Williams appeals his convictions and his sentence for first degree premeditated murder.

ANALYSIS

A. RIGHT TO A PUBLIC TRIAL

Williams argues that the trial court violated his constitutional right to a public trial when the court allowed questioning of juror 25 during the brief period that YouTube was not streaming. We conclude that the record is insufficient to support this argument.

1. Legal Principles

Criminal defendants have a right to a public trial under both the Sixth Amendment to the United States Constitution and article I, sections 10 and 22 the Washington Constitution. *State v. Whitlock*, 188 Wn.2d 511, 519, 396 P.3d 310 (2017). We review de novo the question of law whether a defendant's public trial right has been violated. *Id.* at 520.

We engage in a three-part inquiry to determine whether the public trial right has been violated: (1) whether the proceeding at issue implicated the public trial right, (2) if so, whether the proceeding was closed, and (3) if so, whether the closure was justified. *Id.* The burden is on the defendant regarding the first two questions and the burden is on the State regarding the third question. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015).

2. Analysis

Here, we need not address the first and third questions because Williams cannot prove on this record that the proceeding where juror 25 was questioned was "closed." The Cowlitz

---

[3] The trial court also imposed 171 months of confinement and 18 months of community custody on the first degree robbery conviction, 89 months of confinement on the first degree unlawful possession of a firearm conviction, and 24 months of confinement and 12 months of community custody on the unlawful possession of a controlled substance (methamphetamine) conviction.

County Superior Court's administrative order expressly stated that the public would have access to trial court proceedings through three methods: Zoom, YouTube, and (where possible) televised by a local television station. The evidence suggests that YouTube briefly was not streaming the proceedings. But there is no indication in the record that the proceeding was not accessible through Zoom or that the proceeding was not broadcast on local television.

We acknowledge that whether the public had access to the proceedings through Zoom is somewhat unclear. The administrative order stated that any "party" could observe the proceedings through Zoom, which suggests that only named parties and not the general public could access Zoom. But the order then stated that the Zoom log in was available on the Cowlitz County Superior Court website, which suggests that any member of the public could obtain the log in information from the website and observe on Zoom. The conclusion that the general public had access through Zoom is consistent with the trial court's preliminary statement at the beginning of the trial that "[t]o make this case still open to the public *the proceedings are being broadcast through Zoom* and over YouTube." 1 RP at 180 (emphasis added).

The Supreme Court has emphasized that the defendant bears the burden of providing an adequate record to show a violation of the public trial right. *State v. Slert*, 181 Wn.2d 598, 608, 334 P.3d 1088 (2014) (plurality opinion); *see also State v. Koss*, 181 Wn.2d 493, 503, 334 P.3d 1042 (2014) ("the appellant bears the responsibility to provide a record showing that such a closure occurred in the first place"). On this record, we cannot determine whether the public was able to observe the questioning of juror 25 on Zoom. And on this record, we cannot determine whether the public was able to observe the questioning of juror 25 on television. Therefore, Williams cannot meet his burden of proving that the proceeding was closed.

Accordingly, we hold that Williams cannot establish that the trial court violated Williams's public trial right.

B.      EXPERT TESTIMONY REGARDING SHOOTING A GUN

Williams argues that the trial court erred by admitting testimony from the State's firearm expert witness, which Williams claims was an improper opinion regarding his guilt. We disagree.

1.      Legal Principles

We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Slater*, 197 Wn.2d 660, 667, 486 P.3d 873 (2021). An abuse of discretion occurs when the trial court's decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.*

Witnesses generally may not give opinions regarding a defendant's guilt, either directly or by implication. *State v. Quaale*, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." *Id.* However, the fact that an opinion supports a finding of guilt does not make that opinion improper. *State v. Blake*, 172 Wn. App. 515, 523, 298 P.3d 769 (2012).

2.      Analysis

Williams claims that sergeant Wiper's testimony about anticipation of recoil was an improper opinion regarding his intent to shoot the store clerk because Wiper was commenting on Williams's state of mind. Williams's intent to shoot was relevant to premeditation, one of the elements of first premeditated degree murder.

Here, the trial court ruled that Wiper could testify about firearm mechanics but could not testify as to the mindset, thoughts, intent, or perceived anticipation of the man in the surveillance videos. Wiper's testimony explaining the mechanics and movements associated with recoil and how people sometimes respond when anticipating recoil was in accordance with the trial court's ruling. And he testified that several actions in the surveillance video were "consistent with" the anticipation of recoil. By choosing his language carefully, Wiper did not testify about the intent of the man in the video or even indirectly comment on the man's guilt. *See State v. Montgomery*, 163 Wn.2d 577, 592, 183 P.3d 267 (2008) (suggesting that counsel use the phrase "is it consistent with" to avoid asking witnesses to express their personal beliefs). The mere fact that the opinion allowed the jury to draw their own conclusions about the man's intent does not render the testimony improper.

Accordingly, we hold that the trial court did not abuse its discretion in admitting Wiper's opinion testimony regarding the anticipation of recoil.

C.     LIFE WITHOUT PAROLE SENTENCE

Williams argues that he is entitled to resentencing on the first degree premeditated murder conviction because the trial court did not adequately consider the mitigating qualities of his youth. We agree.

1.     Legal Principles

In *State v. Bassett*, the Supreme Court held that sentencing juvenile offenders to life in prison without parole or release (LWOP) constitutes cruel punishment in violation of article I, section 14 of Washington Constitution. 192 Wn.2d 67, 91, 428 P.3d 343 (2018). The court's holding was expressly limited to the sentencing of juveniles. *Id.* at 73, 91.

Subsequently, the Supreme Court in *Monschke* held that the mandatory imposition of LWOP sentences also was unconstitutional for offenders who were 18 to 20 years old. 197 Wn. 2d at 326, 329. The court noted the factors that supported extension of constitutional protection to juveniles: "juveniles' lack of maturity and responsibility, their vulnerability to negative influences, and their transitory and developing character." *Id.* at 321. These same factors "weigh[ed] in favor of offering similar constitutional protections to older offenders, also, because neurological science recognizes no meaningful distinction between 17- and 18-year-olds as a class." *Id.*

The court concluded that because "no meaningful neurological bright line exists . . . between age 17 on the one hand, and ages 19 and 20 on the other hand . . . , sentencing courts must have discretion to take the mitigating qualities of youth . . . into account for defendants younger and older than 18." *Id.* at 326. In other words, "[j]ust as courts must exercise discretion before sentencing a 17-year-old to die in prison, so must they exercise the same discretion when sentencing an 18-, 19-, or 20-year-old." *Id.* at 329.

The court expressly declined to rule that LWOP sentences for older defendants was categorically unconstitutional because the petitioners had neither argued nor shown that such a holding was warranted. *Id.* at 326. Instead, the court stated, "Not every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will. We leave it up to sentencing courts to determine which individual defendants merit leniency for these characteristics." *Id.*

In *State v. Ramos*, the Supreme Court addressed how a trial court must consider the defendant's youthfulness when sentencing a juvenile facing an LWOP sentence. 187 Wn.2d 420, 442-43, 387 P.3d 650 (2017). The court stated,

> The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's "chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences." It is also necessary to consider the juvenile's "family and home environment" and "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." And where appropriate, the court should account for "incompetencies associated with youth" that may have had an impact on the proceedings, such as the juvenile's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."

*Id.* at 443-44 (citations omitted) (quoting *Miller v. Alabama*, 567 U.S. 460, 477-78, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012)).

Under *Monschke*, trial courts necessarily must apply these same considerations to 18- 20-year-old defendants as well as to juveniles. *See* 197 Wn.2d at 326, 329.

2. Analysis

Because Williams was 19 years old at the time he committed first degree premeditated murder, there is no question under *Monschke* that the trial court had an obligation to consider the mitigating qualities of his youth. 197 Wn.2d at 326, 329. Even though *Monschke* was decided after the trial court sentenced Williams, the court anticipated *Monschke* and assumed that it had the authority to impose less than an LWOP sentence. Despite assuming this authority, the court decided to impose an LWOP sentence.

The State argues that the trial court did not err in imposing an LWOP sentence because the court considered Williams's youth. The court did in fact note Williams's youth and acknowledged that his disregard of life in part was emblematic of a juvenile mind. And the court stated that it had given consideration to Williams's youth before exercising its discretion to impose an LWOP sentence.

However, the trial court did not engage in the extensive and detailed inquiry into the characteristics of youthfulness required under *Ramos*, 187 Wn.2d at 443-44. In addition, defense

13

counsel did not present any evidence regarding the mitigating qualities of Williams's youth because he believed that the trial court was required to impose an LWOP sentence. As a result, the trial court's consideration of Williams's youth was inadequate under existing law.

We hold that Williams is entitled to be resentenced on the first degree premeditated murder conviction in a proceeding in which the trial court fully considers the mitigating qualities of his youth.

D.    UNLAWFUL POSSESSION OF A CONTROLLED SUBSTANCE

Williams argues, and the State concedes, that his conviction for unlawful possession of a controlled substance must be vacated under *Blake*. We agree.

In *Blake*, the Supreme Court held that Washington's strict liability drug possession statute, RCW 69.50.4013(1), violates state and federal due process clauses and therefore is void. 197 Wn.2d at 195. As a result, any conviction based on RCW 69.50.4013(1) is invalid and anyone convicted under that statute is entitled to have their conviction vacated. *State v. LaBounty*, 17 Wn. App. 2d 576, 581, 487 P.3d 221 (2021).

Accordingly, on remand the trial court must vacate and dismiss with prejudice Williams's unlawful possession of a controlled substance conviction. Because this vacation will affect Williams's offender score, he will be entitled to resentencing on the robbery and firearm possession convictions.

CONCLUSION

We affirm Williams's first degree premeditated murder, first degree robbery and first degree unlawful possession of firearm convictions, but we remand for the trial court to vacate and dismiss with prejudice his unlawful possession of a controlled substance conviction and to resentence him on all remaining convictions.

No. 55269-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

_____
MAXA, P.J.

I concur:

_____
VELJACIC, J.

LEE, J. (concurring in part/dissenting in part) — I concur with the majority that D'Anthony L. Williams' conviction for possession of a controlled substance must be vacated under *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), and that the charge should be dismissed with prejudice on remand. However, I respectfully disagree with the majority that the record is insufficient for Williams to prove a public trial right violation and would hold that the trial court violated Williams' public trial right. Based on the record before us, the trial court violated Williams' public trial right. Accordingly, I would reverse Williams' convictions and remand for a new trial.[4]

I agree with the majority that we engage in a three-part inquiry to determine whether a defendant's public trial right has been violated: "(1) Does the proceeding at issue implicate the public trial right? (2) If so, was the proceeding closed? And (3) if so, was the closure justified?" *State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). I also agree that the defendant bears the burden on the first two steps, and the State bears the burden on the third step. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015), *cert. denied*, 578 U.S. 906, *reh'g denied*, 578 U.S. 1009 (2016). However, I disagree with the majority that there was no public trial right violation.

Here, the record is clear that the proceeding at issue implicated Williams' public trial right, the proceeding was closed, and the closure was not justified. Therefore, I respectfully disagree with the majority and would hold that Williams' public trial right was violated.

A.      THE PROCEEDING AT ISSUE IMPLICATED THE PUBLIC TRIAL RIGHT

It is well settled that the public trial right attaches to jury selection, including for-cause and peremptory challenges. *Id.* at 605-06. However, the public trial right does not attach to

---

[4] While I disagree with the majority on the public trial right issue and would reverse and remand for a new trial, to the extent the issues must be reached, I agree with the majority's analysis on the remainder of the issues addressed in the majority's opinion.

preliminary excusals of prospective jurors for statutory reasons, including hardship, based on juror questionnaires. *State v. Russell*, 183 Wn.2d 720, 730, 357 P.3d 38 (2015). This is because "[d]etermining whether a juror is able to serve at a particular *time* or for a particular *duration* (as in hardship and administrative excusals) is qualitatively different from challenging a juror's ability to serve as a neutral factfinder in a particular *case* (as in peremptory and for-cause challenges)." *Id.* at 730-31.

Here, the proceeding involved was not a preliminary excusal of a prospective juror for hardship or administrative reasons. Rather, the proceeding at issue involved inquiries into the prospective juror's qualifications to serve as a neutral factfinder and a dismissal for cause. Specifically, the trial court placed juror 25 under oath and questioned them regarding their concerns about sitting on the jury. Juror 25 listed several potential reasons why they would be unable to be fair or impartial in this case, including a connection to the judge's children, the fact that both of the juror's sons had gone to prison, and the anxiety the juror was experiencing from being at the court. When juror 25 began crying, the trial court asked if the juror's emotions would make it difficult or impossible to sit fairly as a juror. Juror 25 responded that they did not know if they would be the best person to make decisions. Following this questioning, the trial court allowed the attorneys an opportunity to question juror 25. The trial court then excused the juror for cause.

The trial court's question about fairness shows that the trial court was concerned about juror 25's ability to serve as a neutral factfinder. Undisputedly, juror 25's dismissal was for cause and was not a hardship excusal. Because juror 25's dismissal was for cause, the public trial right attached to the proceedings related to juror 25's questioning and subsequent dismissal.

B.    THERE WAS A CLOSURE

If the proceeding implicates the public trial right, we ask if the proceeding was closed. *Smith*, 181 Wn.2d at 521. "A defendant asserting violation of his public trial rights must show that a closure occurred." *State v. Njonge*, 181 Wn.2d 546, 556, 334 P.3d 1068, *cert. denied*, 574 U.S. 1065 (2014). A closure occurs "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). Courtroom closures can occur even in the absence of an explicit court order. *See State v. Wise*, 176 Wn.2d 1, 13, 288 P.3d 1113 (2012) (holding that public trial right was violated where trial court privately questioned individual jurors in chambers during voir dire); *State v. Heath*, 150 Wn. App. 121, 128, 206 P.3d 712 (2009) (holding that public trial right was violated where trial court never explicitly ordered the proceeding to be closed), *review dismissed*, 173 Wn.2d 1001 (2011).

The majority posits that "there is no indication in the record that the proceeding was not accessible through Zoom or that the proceeding was not broadcast on local television." Majority at 9. I disagree.

First, the record is clear that the public did not have access to the proceedings through the Zoom platform. The Cowlitz County Superior Court administrative order stated that the Zoom platform was restricted to the parties and thus was not available to the public—"*any party* can hear and observe the proceedings by logging into the ZOOM hearing." Admin. Order No. 2020-003-08, *In re Superior Court Courtroom Proceedings Held in a Virtual Courtroom*, at 2 (Cowlitz County Super. Ct., Wash. July 27, 2020), https://www.cowlitzsuperiorcourt.us/all-forms/318-administrative-order-no-2020-003-08/viewdocument/318 [https://perma.cc/5ACA-ZH4U]. (emphasis added).

18

Second, the trial court, at the beginning of the trial, stated on the record that the public was only able to access the proceedings through YouTube—"[T]he process that's been developed for this courtroom is that the public is excluded from being in the courtroom. *All proceedings are broadcast on YouTube*, so that the public has full access to the proceedings." 1 Verbatim Report of Proceedings (VRP) at 59 (emphasis added).

Third, the record shows that the proceedings were not being broadcast on local television. The administrative order made clear that the option of broadcasting proceedings over local television was not a consistent means of providing public access to trials—"*Where possible, jury trials held when this Order is in effect will also be televised through Kelso Longview Television (KLTV)*." Admin. Order No. 2020-003-08, at 2 (emphasis added). Given the administrative order and the trial court's affirmative statement that the proceedings were being broadcast on YouTube without any mention of local television leads to only one reasonable conclusion—that the only means the public had to access the proceedings was through YouTube.[5]

During the proceeding involving juror 25, the trial court made multiple statements on the record confirming that it knew the streaming for the public was down. Before juror 25 was brought into the courtroom for questioning, the trial court stated that someone was looking at YouTube "and we are not streaming." 1 VRP at 61. Following this statement, the trial court had juror 25 brought into the courtroom for questioning. While waiting for juror 25 to enter the courtroom, the trial court conversed with court staff on the record, stating that "it's still not streaming," and indicated that court staff was communicating with someone about the streaming issue. 1 VRP at

---

[5] The majority's requirement for Williams to affirmatively *disprove* that any other hypothetical method for observing his trial was available goes beyond the burden imposed by our case law. Further, the majority creates an insurmountable burden by requiring defendants to produce past streaming data or records that are generally not in their own possession and the retention of which depends solely on the trial court, if it is retained at all.

61. The trial court then conducted its questioning of juror 25, after which Williams' attorney stated that he had "Zoom/YouTube video on [his] smartphone" and "[i]t did not appear [indiscernible] there is no content," showing that the streaming of the proceedings for the public remained inaccessible. 1 VRP at 64.

The record shows that the trial court undoubtedly knew the video stream for the public was inaccessible when the court decided to question juror 25 and then dismiss juror 25 for cause. Because the video streaming was the only manner in which the public could enter, leave, or observe the proceedings, the trial court's decision to conduct part of the jury selection when it knew the streaming service was down and inaccessible to the public constituted a complete and purposeful closure of the courtroom to spectators. *See Lormor*, 172 Wn.2d at 93. Therefore, based on the record before us, there was a closure.

C.     THE CLOSURE WAS NOT JUSTIFIED

If the proceeding at issue implicates the public trial right and was closed, we ask if the closure was justified. *Smith*, 181 Wn.2d at 521. A courtroom closure can be justified if the trial court conducts an on-the-record *Bone-Club*[6] balancing test. *Njonge*, 181 Wn.2d at 553.

"A closure unaccompanied by a *Bone-Club* analysis on the record will almost never be considered justified." *Smith*, 181 Wn.2d at 520. But "[w]hen a court fails to conduct an express *Bone-Club* analysis, a reviewing court may examine the record to determine if the trial court effectively weighed the defendant's public trial right against other compelling interests." *Id.*

---

[6] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995). In *Bone-Club*, our Supreme Court established five factors that trial courts must consider on the record before closing trial proceedings to the public. *Id.* at 258-59. *Bone-Club* requires trial courts to (1) name the right that a defendant and the public will lose by closing the proceeding; (2) name the compelling interest motivating the closure; (3) weigh those competing rights and interests on the record; (4) provide the opportunity for objection; and (5) consider alternatives to closure, opting for the least restrictive. *Wise*, 176 Wn.2d at 10.

Here, the trial court did not conduct a *Bone-Club* analysis on the record when the only means of public access was inaccessible. Further, the record does not provide any hint that the trial court acknowledged or considered Williams' public trial right, let alone weighed that right against other compelling interests. Therefore, the courtroom closure in this case was not justified. *See id.* Accordingly, the trial court violated Williams' right to a public trial. *See id.* at 521.

D. REMEDY

Where a defendant's public trial right is violated by the closure of part of voir dire proceedings, the appropriate remedy is to vacate the conviction and remand the case for a new trial. *See Wise*, 176 Wn.2d at 19 (vacating conviction and remanding case for new trial where public trial right was violated by closure of part of voir dire proceedings). Therefore, Williams' convictions should be vacated and remanded for a new trial.[7]

CONCLUSION

Williams has met his burden of showing that a closure occurred. The closed proceeding implicated his right to a public trial, and the closure was not justified. Therefore, the trial court violated Williams' public trial right. Accordingly, I would reverse Williams' convictions and remand for a new trial.

_J., J._

Lee, J.

---

[7] The State contends that any public trial right violation was de minimis and therefore does not require reversal. In making this argument, the State relies on the lead plurality opinion in *State v. Schierman*, which held that the trial court's decision to hear and rule on for-cause challenges in chambers violated the public trial right but was a de minimis violation that did not require automatic reversal. 192 Wn.2d 577, 610, 614, 438 P.3d 1063 (2018) (plurality opinion). However, that same lead plurality opinion stated that our Supreme Court's precedent "forecloses the possibility of de minimis violations involving juror questioning." *Id.* at 613. Therefore, the trial court's questioning of juror 25 cannot constitute a de minimis violation.