# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60338-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| GREGORY STEELE, | |
| Appellant. | |

CHE, J. — Gregory Steele appeals his sentence after pleading guilty to two counts of vehicular homicide.

As part of the plea agreement, Steele pleaded guilty to reduced charges of two counts of vehicular homicide by admitting he drove under the influence of alcohol in a way that caused the death of two people. In exchange, the State agreed to recommend 95 months in custody, the low end of the sentencing range. At sentencing, the court heard from several people and considered several letters in support of the victims and Steele. Both parties recommended the low end of the sentencing range. The trial court sentenced Steele to the high end of the sentencing range.

Steele argues the State breached the plea agreement and violated Steele's right to due process by undermining its recommendation for a 95-month sentence.

We hold the State did not breach the plea agreement.  Thus, the State did not violate Steele's due process right.  Accordingly, we affirm Steele's sentence.

FACTS

I. BACKGROUND

In April 2023, Steele, while under the influence of alcohol, drove against the flow of traffic up an on-ramp and collided with another car.  The other car had three occupants—driver Levi Moser and passengers BM and SW.[1]  Moser died at the scene and BM died at the hospital a short time later.  SW survived and was treated at a hospital.  Steele's front seat passenger, Ayana Orden-Scott, sustained injuries.  Steele's blood alcohol concentration measured 0.14 within two hours of the collision.[2]

The State initially charged Steele with vehicular homicide of Moser, vehicular assault of BM, and vehicular assault of Orden-Scott.  Later that same day, the State filed an amended information increasing the vehicular assault charge involving BM to vehicular homicide.  In a second amended information, the State dropped the charge against Steele for vehicular assault of Orden-Scott.

Steele agreed to plead guilty to two counts of vehicular homicide for Moser and BM.  Steele stipulated to having an offender score of 2, which he agreed resulted in a sentencing range

---

[1] The names of minor victims are abbreviated throughout this opinion.

[2] The foregoing background facts, as described in Steele's briefing, are undisputed.  In his briefing of these facts, Steele cites primarily to the State's declaration for determination of probable cause, as well as the report of proceedings March 29, 2024, sentencing hearing.  Thus, we adopt these facts for the purpose of providing relevant background information.  *See City of Bremerton v. Bright*, 32 Wn. App. 2d 465, 467 n.1, 556 P.3d 739 (2024) (where this court provided background facts based upon undisputed and uncontested facts from the parties' briefing).

of 95-125 months confinement for each count.  As part of Steele's plea agreement, the State agreed to recommend a sentence of 95 months concurrent confinement for each count among other recommendations related to sentencing.

At the change of plea hearing, the trial court engaged in a colloquy with Steele, ensuring that Steele read the form and carefully went over it with his attorney who answered all his questions, ensuring Steele understood the rights he was giving up by pleading guilty, presenting the maximum penalty for each crime, and notifying Steele that the sentencing judge "is not required, by law, to follow the recommendations as to a sentence.  He or she may impose any lawful sentence."  3 Rep. of Proc. (RP) (Feb. 21, 2024) at 48-49.  The court then accepted Steele's guilty pleas as knowingly, intelligently, and voluntarily made with an understanding of the consequences of pleading guilty.

## II. Sentencing Hearing

At sentencing, the State outlined the events that gave rise to the convictions.  The State said that Steele considered getting a rideshare after drinking with Orden-Scott, but he decided to drive himself.  The State described the collision as "huge" and stated that the victims were driving a "very small" car and that Steele was driving a "very large" car.  1 RP (Mar. 29, 2024) (1 RP) at 4.

The State began to explain the process of talking with the families about the plea resolution, but the trial court interrupted by asking what had happened to SW.  The State answered that SW did not sustain substantial bodily harm but that her dog in the vehicle died. The State continued,

> Ultimately, Your Honor, this was completely avoidable. It was completely avoidable. Even Mr. Steele said himself to the law enforcement officers at his interview, he had a plan to make it completely avoidable. And he didn't.
>
> And really what this case marks is a tremendous loss, a loss of potential. Both [BM and Moser] were young; they were just getting started in their lives. They had families that loved them that dearly. And those families are here today to talk to the Court.
>
> Ultimately, Your Honor, Mr. Steele pled guilty on February 21st of 2024. At the time of the collision, Mr. Steele had an ethanol content of .14. And the State agreed because he was taking responsibility to two counts of vehicular homicide, one for [BM] and one for [Moser], to recommend the low end of the sentencing range which is 95 to 125 months.

1 RP at 5.

The trial court then asked the State why the vehicular assault count involving Orden-Scott was not part of the plea agreement. The State responded,

> I can provide some context.
>
> My office struggled to contact Ms. Orden-Scott. It appears that there was some lapsed communication, and we at the time of the plea did not believe that we had contact with her. She made contact with us shortly after the plea, and we would have done things differently had we not had that lapse in communication. But we did and so we're here.

1 RP at 6.

The trial court continued its inquiry of the State and asked how Orden-Scott's vehicular assault count would have affected the sentence. The State answered that Steele's offender score would have gone up from 2 to 4 and that this would have added 15-16 months to his sentence.

The State explained that, in resolving the case and talking to the victims' families, it had considered the legislature's limits on the State when prosecuting like cases and that Steele's sentencing range on two vehicular homicides was low because he did not intend to kill Moser and BM. The State concluded by stating, "But that doesn't mean that they're not just gone.

Ultimately, Your Honor, [Steele] did take responsibility. He pled guilty to two counts." 1 RP at 6.

The trial court stated that it had received letters from family members impacted by the crimes who requested the maximum sentence. The court then asked the State if any aggravating circumstances applied that would allow the court to give Steele the maximum sentence. The State responded that there were not and that the State had considered certain aggravators, but none were available.

The trial court continued to inquire of the State about possible aggravators, including one for multiple victims. After clarifying that the multiple victims aggravator did not apply in this case because each count only applied to one victim, the State said, "Mr. Steele did come to the Court with a prior [felony] theft conviction, but it washed so we weren't able to calculate that in his offender score." 1 RP at 9. When the court then asked whether conduct that washes could justify an aggravated sentence, the State stated it did not believe so.

The trial court then heard from relatives and friends of the deceased victims and watched a video submitted by the victims' families. In addition to submitting a written statement—which the trial court acknowledged it had read—Orden-Scott spoke at the hearing about the lasting, detrimental mental, physical, and financial effects of her injuries, which included a broken right humerus requiring reconstruction with rods and screws, bilateral hand fractures, rib fracture, three separate back fractures, herniated disk in her cervical spine, injury to her legs, a black eye, internal bleeding from her colon, risk of sepsis, complex post-traumatic stress disorder, bumps, bruises, and contusions all over her body.

Neither Steele nor his counsel objected to any of the above statements.

Steele's counsel requested the trial court to impose the agreed-upon low-end sentence of 95 months confinement, which met the purposes of the Sentencing Reform Act. Steele's counsel had also submitted numerous familial letters in support of Steele. Steele addressed the court.

Before imposing sentence, the trial court acknowledged that it had considered the letters and statements from friends and relatives of Moser, BM, and Orden-Scott, as well as Steele's allocution statement. The court also acknowledged that both Steele and the State had asked for a low-end sentence of 95 months.

The trial court then explained it had considered many factors relevant to an appropriate sentence, including the statements from individuals impacted, Steele's criminal history, letters of support for Steele, sentences for similar crimes, and protection of the public. The court also stated:

> The other thing I'm thinking about is Ms. Orden-Scott, what happened. Originally, her count was charged, and it was dropped as part of the plea agreement, but also what [the State] explained. But it's still -- having considered the impact it has on her, [the State] thought that probably if that count had been included, it would have added 15 to 16 months to the sentence, which would have taken it to about 140 as the high end.

1 RP at 54. The court imposed a high end sentence of 125 months of confinement.

Steele appeals.

ANALYSIS

Steele contends the State breached the plea agreement and violated his right to due process by undermining its recommendation for a low-end sentence by making certain prejudicial statements at sentencing. In response, the State argues that Steele did not preserve the issue of breach of plea agreement for appeal, and because Steele fails to demonstrate that a manifest constitutional error occurred under RAP 2.5(a)(3), we should decline to consider the

merits of Steele's claim. Further, if we address the claim, then the State contends it did not breach the plea agreement. Assuming without deciding that Steele meets the requirements of RAP 2.5, we conclude that the State did not breach the plea agreement.

## I. LEGAL PRINCIPLES

### A. *RAP 2.5(a)(3)*

Generally, we do not consider claims raised for the first time on appeal. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); *see* RAP 2.5(a). However, under RAP 2.5(a)(3), a party may raise an error for the first time on appeal if they show that the error presents "a "manifest error affecting a constitutional right." An error is "manifest" if it causes actual prejudice, which occurs where there is a plausible showing that the error caused "practical and identifiable consequences" in the proceeding. *Kirkman*, 159 Wn.2d at 935 (internal quotation marks omitted). Further, for the purposes of a RAP 2.5(a)(3) analysis, a breach of a plea agreement is an issue of constitutional magnitude. *State v. Van Buren*, 101 Wn. App. 206, 211-12, 2 P.3d 991 (2000); *see also State v. Walsh*, 143 Wn.2d 1, 7-8, 17 P.3d 591 (2001).

### B. *Breach of Plea Agreement*

We review whether the State has breached a plea agreement de novo. *State v. Molnar*, 198 Wn.2d 500, 513, 497 P.3d 858 (2021).

"A plea agreement is a contract." *State v. Harris*, 4 Wn.3d 108, 117, 559 P.3d 499 (2024). "Because plea agreements concern an accused's fundamental rights," the State's breach of a plea agreement violates the defendant's due process rights.[3] *Id*. at 117. To determine

---

[3] When a party breaches a plea agreement, the nonbreaching party may choose rescission or specific performance as a remedy. *Harris*, 4 Wn.3d at 118.

whether a breach has occurred, we consider the entire sentencing record and engage in an objective inquiry. *State v. Carreno-Maldonado*, 135 Wn. App. 77, 83, 143 P.3d 343 (2006).

"The State is not obligated to enthusiastically make a sentencing recommendation, but it must participate in sentencing proceedings, answer the court's questions with candor, and cannot withhold relevant information regarding the plea agreement." *Harris*, 4 Wn.3d at 117. However, "[a] breach occurs when the State "'undercut[s] the terms of the agreement explicitly or implicitly by conduct evidencing an intent to circumvent the terms of the plea agreement.'" *State v. Ramos*, 187 Wn.2d 420, 433, 387 P.3d 650 (2017) (some alterations in original) (quoting *Carreno-Maldonado*, 135 Wn. App. at 83). Such a breach can occur by offering unsolicited information through testimony, a report, or argument. *Harris*, 4 Wn.3d at 117. In determining whether the State undercut the plea agreement, we focus on the effect of the State's actions rather than its intent behind them. *Ramos*, 187 Wn.2d at 433.

## II. THE STATE DID NOT BREACH THE PLEA AGREEMENT

Here, even if we assume without deciding that Steele's argument meets the requirements of RAP 2.5(a)(3), we conclude that his breach of plea argument fails.

First, Steele argues the State breached the plea agreement when it told the court it had agreed to recommend "the low end of the sentencing range," rather than specifically saying "95 months." Br. of Appellant at 16. But Steele's own counsel referred to the 95 months as "the low end herein," and the court noted at sentencing, "[b]oth parties ha[d] asked for a sentence of 95 months." 1 RP at 53. Because it is clear the State's remark had no effect on the court's understanding of its recommendation, the State did not breach the plea agreement by referring to the agreed recommendation as one for "the low end of the sentencing range." *See Ramos*, 187

Wn.2d at 433 (In determining whether the prosecutor undercut the agreement, we apply an objective standard focusing on the effect of the prosecutor's actions.).

Next, Steele contends the State breached the plea agreement when it (1) stated the collision was "huge" and "avoidable," the victims were driving a "very small" car, and Steele was driving a "very large" car; (2) mentioned the fact that SW's dog was also killed in the collision; and (3) "implied that Steele was "extra culpable because '[the collision] was completely avoidable.'" Br. of Appellant at 16-17 (quoting 1 RP at 4). Steele analogizes these statements to those made by the State in *State v. Xaviar*, 117 Wn. App. 196, 69 P.3d 901 (2003), and *Carreno-Maldonado*, 135 Wn. App 77, 143 P.3d 343 (2006).

In *Xaviar*, as part of the plea agreement, the State agreed to recommend a sentence at the low end of the standard sentencing range. 117 Wn. App. at 198. However, at sentencing, the State made a series of unsolicited remarks that "obviously" referred to aggravating factors justifying an exceptional sentence. *Id*. at 200-01. The statements "clearly signaled to the court [the State's] lack of support for a standard range sentence." *Id*. at 201.

In *Carreno-Maldonado*, the State agreed to recommend sentences within the standard sentencing range of each count. 135 Wn. App. at 79. But at sentencing, the State recited certain "potentially aggravating facts." *Id*. at 84. We held the State's conduct breached the plea bargain because those remarks "went beyond what was necessary to support" the sentencing recommendations and were not made in response to information requested by the trial court or argument by the defense. *Id*. at 85. In both cases, we held the State breached the plea agreement by highlighting aggravating factors at sentencing and, accordingly, reversed and remanded. *Xaviar*, 117 Wn. App. at 201, 206; *Carreno-Maldonado*, 135 Wn. App. at 84-85, 89.

Steele claims, similar to *Xaviar*, and *Carreno-Maldonado*, the State breached the plea agreement by emphasizing factors that urged the court to impose a higher sentence. However, the State's conduct, which was held to be a breach in *Xaviar* and *Carreno-Maldonado* is distinguishable from the conduct Steele challenges here. The challenged statements in *Xaviar*, and *Carreno-Maldonado* clearly referred to aggravating factors that justified an exceptional sentence or otherwise potentially aggravating facts. *Xaviar*, 117 Wn. App. at 200-01, *Carreno-Maldonado*, 135 Wn. App at 84.

Whereas here, the State's comments do not clearly refer to potentially aggravating facts and there is no indication the State made the statements to undercut the plea agreement. Instead, the trial court raised the issue of aggravating factors because of letters submitted requesting the maximum sentence. And when asked whether any aggravating factors applied, the State repeatedly stated that no aggravating factors applied in Steele's case. Because *Xaviar* and *Carreno-Maldonado* are inapposite, and Steele fails to otherwise show how the challenged statements undercut the agreed recommendation, we conclude the State did not breach the plea agreement based on these statements.

Last, Steele challenges the State's responses to the court's various inquiries, including the State's description of SW's injuries, its mention of Steele's prior theft offense, its explanation behind why the State dropped the vehicular assault count involving Orden-Scott, and the State's research and results regarding whether any aggravating factors applied. Steele contends that the State's answers contained unsolicited information, and as a result, undermined the agreed-upon sentencing recommendation.

The record shows, however, that the State made the challenged statements in response to the trial court's questions, and thus, they were not unsolicited statements. When asked what happened to SW, the State responded by describing the consequences of the crash, including describing SW's injuries and mentioning the death of SW's dog. When the court asked about the dropped vehicular assault charge involving Orden-Scott, the State provided context on how it had lost contact with Orden-Scott and that the State would have done things differently had it not lost contact. The State also noted that it had considered the limits set by the legislature and because "Steele did not set out with the intent to kill [BM] and [LM], his sentencing range [was] low." 1 RP at 6. The State also commented, "Ultimately . . . [Steele] did take responsibility. He pled guilty to two counts." 1 RP at 6. After the court's repeated inquiries about potential aggravating circumstances, the State mentioned Steele had a prior theft conviction which had washed and did not affect his offender score.

The State made its remarks in response to the court's inquiries and relevantly to the information requested. Accordingly, its remarks do not show an intent to circumvent the plea agreement because the State has an obligation to answer the court's questions candidly and not withhold relevant information regarding the plea agreement. *Harris*, 4 Wn.3d at 117.

We hold the State did not breach the plea agreement. Thus, the State did not violate Steele's due process right. Accordingly, we affirm Steele's sentence.

No. 60338-1-II

CONCLUSION

We affirm Steele's sentence.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Maxa, P.J.

_____
Lee, J.